Tucker Bingham (AZ#037427)
National Labor Relations Board, Region 28
2600 N. Central Avenue, Suite 1400
Phoenix, Arizona 85004
Tel: (602) 416-4746
Fax:(602) 640-2178
Email: tucker.bingham@nlrb.gov
Attorney for Petitioner

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

**Cornele A. Overstreet,**
**Regional Director of the Twenty-Eighth**
**Region of the National Labor Relations**
**Board, for and on behalf of the**
**National Labor Relations Board,**

                          **Petitioner,**
    **v.**

**Lucid USA, Inc.**

                          **Respondent.**

Case No.

**PETITIONER'S MEMORANDUM OF**
**POINTS AND AUTHORITIES IN**
**SUPPORT OF**
**PETITION FOR TEMPORARY**
**INJUNCTION UNDER SECTION 10(j)**
**OF THE NATIONAL LABOR**
**RELATIONS ACT, AS AMENDED**
**[29 U.S.C. § 160(j)]**

**TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS ......................................................................... 2

       A.   Respondent's Operations and Timeclock Procedures .......................... 2

       B.   Respondent Immediately Opposes Employees'
            Nascent Organizing Campaign ............................................................ 3

       C.   Respondent Discharges Lead Union Activists Hansen
            and Brewer ........................................................................................... 6

       D.   Impact of the Unlawful Discharges on the Organizing
            Campaign .............................................................................................. 9

III.   STATUTORY SCHEME PURSUANT TO WHICH
       INJUNCTIVE RELIF IS SOUGHT: THE APPLICABLE
       STANDARDS ......................................................................................... 11

       A.   Likelihood of Success on the Merits .................................................. 13

       B.   Irreparable Harm, Balancing the Equities, and the
            Public Interest .................................................................................... 14

IV.    INJUNCTIVE RELIEF IS APPROPRIATE IN THIS
       MATTER ................................................................................................ 16

       A.   Petitioner's Affidavits and Exhibits Demonstrate a
            Substantial Likelihood of Success on the Merits ............................... 16

            1.   Petitioner Has Shown a Substantial Likelihood
                 of Success on the Allegations that Respondent
                 Has Interfered with Employees' Rights in
                 Violation of Section 8(a)(1) of the Act .................................... 17

            2.   Petitioner Has Shown a Substantial Likelihood
                 of Success on the Allegations that Respondent
                 Unlawfully Transferred Hansen and Then
                 Discharged both Hansen and Brewer in
                 Violation of Section 8(a)(3) of the Act .................................... 27

i

B.    Interim Relief is Just and Proper to Prevent Irreparable
        Harm to the Employees' Statutory Rights and to
        Protect the Efficacy of the Board's Final Order....................................34

        1.    Interim Reinstatement Offers to Hansen and
              Brewer are Just and Proper to Preserve the
              Employees' Free Choice to Continue the
              Organizing Campaign ................................................................34

        2.    Additional Relief is Just and Proper to Protect
              the Employees' Statutory Rights................................................42

        3.    Serious Threatened Public Harm Outweighs any
              Harm to Respondent; Public Interest is Served
              by an Injunction..........................................................................43

V.    CONCLUSION ................................................................................44

1

# TABLE OF AUTHORITIES

2

Cases

*Abbey's Transp. Servs., Inc. v. NLRB,*
    837 F.2d 575 (2d Cir. 1988) ..................................................................36
*Aguayo v. Tomco Carburetor Co.,*
    853 F.2d 744 (9th Cir. 1988) ........................................................... Passim
*Alliance for the Wild Rockies v. Cotrell,*
    632 F.3d 1127 (9th Cir. 2011) .............................................................12
*American Tissue Corp.,*
    336 NLRB 435 (2001).............................................................................18
*Amoco Prod. Co. v. Village of Gambell,*
    480 U.S. 531 (1987) .................................................................................14
*Angle v. Sacks,*
    382 F.2d 655 (10th Cir. 1967) ......................................................... Passim
*Arlook v. S. Lichtenberg & Co.,*
    952 F.2d 367 (11th Cir. 1992) ..............................................................42
*Arrow Automotive Industries,*
    258 NLRB 860 (1981) .............................................................................20
*Asseo v. Bultman Enterprises, Inc.,*
    913 F. Supp. 89 (D. P.R. 1995) ............................................................44
*Asseo v. Pan Am. Grain Co.,*
    805 F.2d 23 (1st Cir. 1986) ...........................................................44, 45
*Bally's Park Place, Inc. v. NLRB,*
    646 F.3d 929 (D.C. Cir. 2011) ..............................................................19
*Bandag, Inc. v. NLRB,*
    583 F.2d 765 (5th Cir. 1978) ..............................................................37
*Bates Paving & Sealing, Inc.,*
    364 NLRB No. 46 (2016).......................................................................24
*Beth Israel Hosp. v. NLRB,*
    437 U.S. 483 (1978) .................................................................................37
*Bloedorn v. Francisco Foods,*
    276 F.3d 270 (7th Cir. 2001) ..........................................14, 16, 36, 42
*Bridgestone Firestone South Carolina,*
    350 NLRB 526 (2007)............................................................................25
*C & W Super Markets, Inc. v. NLRB,*
    581 F.2d 618 (7th Cir. 1978) ..............................................................37
*California Acrylic Industries, Inc. v. NLRB,*
    150 F.3d 1095 (9th Cir. 1998) .....................................................18, 37
*California Gas Transp., Inc. v. NLRB,*
    507 F.3d 847 (5th Cir. 2007) .......................................................18, 37

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Carbonneau Industries*,
  228 NLRB 597 (1977).................................................................................22
*Cemex Construction Materials Pacific, LLC*,
  372 NLRB No. 130 (2023)..........................................................................26
*Center Serv. Sys. Div.*,
  345 NLRB 729 (2005)...........................................................................21, 22
*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
  598 F.3d 30 (2d Cir. 2010) .........................................................................12
*Coffman v. Queen of the Valley Med. Ctr.*,
  895 F.3d 717 (9th Cir. 2018) ................................................................11, 13
*Con-Way Freight*,
  366 NLRB No. 183 (2018)..........................................................................27
*Cooke and Jones, Inc.*,
  146 NLRB 1664 (1964)...............................................................................23
*Desert Springs Hosp. Med. Ctr.*,
  363 NLRB 1824 (2016)...............................................................................27
*Desert Springs Hosp. Med. Ctr.*,
  369 NLRB No. 16 (2020) ............................................................................19
*Dorsey Trailers, Inc. v. NLRB*,
  233 F.3d 831 (4th Cir. 2000) ......................................................................19
*Durham School Services, L.P.*,
  361 NLRB 407 (2014).................................................................................21
*Eastex, Inc. v. NLRB*,
  437 U.S. 556 (1978) ..............................................................................18, 19
*Eisenberg v. Wellington Hall Nursing Home, Inc.*,
  651 F.2d 902 (3d Cir. 1981) .......................................................................44
*Evergreen Am. Corp.*,
  348 NLRB 178 (2006).................................................................................17
*Fabric Warehouse*,
  294 NLRB 189 (1989).................................................................................37
*Flexsteel Industries*,
  311 NLRB 257 (1993).................................................................................25
*Frankl v. HTH Corp.*,
  693 F.3d 1051 (9th Cir. 2012) ..............................................16, 28, 41, 43
*Frankl v. HTH Corp.*,
  650 F.3d 1334 (9th Cir. 2011) ........................................................... Passim
*Frontier Telephone of Rochester, Inc.*,
  344 NLRB 1270 (2005)...............................................................................25
*Garcia v. Sacramento Coca-Cola Bottling Co., Inc.*,
  733 F. Supp. 2d 1201 (E.D. Cal. 2010) .....................................................43
*Golden Day Schools, Inc. v. NLRB*,
  644 F.2d 834 (9th Cir. 1981) ......................................................................30

iv

*Golden State Foods Corp.*,
  340 NLRB 382 (2003)...........................................................................26

*Gottfried v. Frankel*,
  818 F.2d 485 (6th Cir. 1987).................................................................42

*Gottfried v. Mayco Plastics, Inc.*,
  472 F. Supp. 1161 (E.D. Mich. 1979) ....................................................41

*Great Lakes Warehouse Corp.*,
  330 NLRB 807 (2000)...............................................................19, 23, 24

*Hancock Fabrics v. NLRB*,
  902 F.2d 28 (4th Cir.1990).....................................................................37

*Harbor Freight Tools USA Inc.*,
  373 NLRB No. 2 (2023)...........................................................................26

*Healthcare Emps. Local 399 v. NLRB*,
  463 F.3d 909 (9th Cir. 2006)..................................................................30

*Heinrich Motors, Inc. v. NLRB*,
  403 F.2d 145 (2d Cir. 1968)...................................................................41

*Hirsch v. Dorsey Trailers, Inc.*,
  147 F.3d 243 (3d Cir. 1998)...................................................................42

*Hooks v. Nexstar Broad., Inc.*,
  54 F.4th 1101 (9th Cir. 2022)...........................................................15, 36

*Hooks v. Ozburn-Hessey Logistics, LLC*,
  775 F. Supp. 2d 1029 (W.D. Tenn. 2011) ..............................................43

*Horseshoe Bossier City Hotel & Casino*,
  369 NLRB No. 80 (2020).........................................................................22

*Hubbel v. Patrish L.L.C.*,
  903 F. Supp. 2d 813 (E.D. Mo. 2012)....................................................44

*Intertape Polymer Corp*,
  372 NLRB No. 133 (2023).............................................................28, 29, 30

*Kapiolani Hosp. v. NLRB*,
  581 F.2d 230 (9th Cir. 1978)..................................................................31

*Kaynard v. Palby Lingerie, Inc.*,
  625 F.2d 1047 (2d Cir. 1980)...........................................................35, 41

*King v. Amazon.com Services, LLC*,
  2022 WL 17083273 (E.D.N.Y. Nov. 18, 2022) ......................................43

*Lineback v. Irving Ready-Mix, Inc.*,
  653 F.3d 566 (7th Cir. 2011)..................................................................39

*Lucky Cab Co.*,
  360 NLRB 271 (2014).........................................................................29, 30

*Manno Electric, Inc.*,
  321 NLRB 278 (1996).............................................................................24

*Manor Care of Easton, PA LLC*,
  356 NLRB 202 (2010).............................................................................19

*Maple Grove Health Care Ctr.*,
330 NLRB 775 (2000) ............................................................................22

*McDermott v. Ampersand Publishing, LLC*,
593 F.3d 950 (9th Cir. 2010) ................................................................11

*Metal Industries, Inc.*,
251 NLRB 1523 (1980) ..........................................................................20

*Miller v. Cal. Pac. Med.*,
19 F.3d 449 (9th Cir. 1994) ............................................13, 14, 15, 35

*Mondelez Global, LLC*,
369 NLRB No. 46 (2020) .......................................................................31

*Montgomery Ward*,
290 NLRB 981 (1988) ............................................................................24

*Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc.*,
2008 WL 544455 (W.D. Ky. Feb. 27, 2008) ......................................43

*Muffley v. Spartan Mining Co.*,
570 F.3d 534 (4th Cir. 2009) ................................................................42

*N.D. v. Haw. Dep't. of Educ.*,
600 F.3d 1104 (9th Cir. 2010) ..............................................................16

*National Assn. of Govt. Employees (Intl. Bhd. of Police Officers)*,
327 NLRB 676 (1999) ............................................................................31

*NLRB v. C & C Plywood Corp.*,
385 U.S. 421 (1967) ................................................................................39

*NLRB v. Electro-Voice, Inc.*,
83 F.3d 1559 (7th Cir. 1996) ......................................................... Passim

*NLRB v. Exchange Parts Co.*,
375 U.S. 405 (1964) ................................................................................37

*NLRB v. Gen. Teamsters Local No. 439, Int'l Bhd. of Teamsters, AFL-CIO*,
175 F.3d 1173 (9th Cir. 1999) ..............................................................34

*NLRB v. Henry Colder Co.*,
447 F.2d 629 (7th Cir. 1971) ................................................................37

*NLRB v. Illinois Tool Works*,
153 F.2d 811 (7th Cir. 1946) ................................................................18

*NLRB v. Jamaica Towing, Inc.*,
632 F.2d 208 (2d Cir. 1980) ................................................................36

*NLRB v. Jones & Laughlin Steel Corp.*,
301 U.S. 1 (1937) ...........................................................................34, 40

*NLRB v. Link-Belt Co.*,
311 U.S. 584 (1941) ................................................................................38

*NLRB v. Longhorn Transfer Serv., Inc.*,
346 F.2d 1003 (5th Cir. 1965) ..............................................................38

*NLRB v. Ona Corp.*,
605 F. Supp. 874 (N.D. Ala. 1985) ..............................................38, 41

*NLRB v. Transportation Management Corp.*,
  462 U.S. 393 (1983) .................................................................28, 34

*NLRB v. Ultra-Sonic De-Burring, Inc., of Texas*,
  593 F.2d 123 (9th Cir. 1979) ..................................................38

*Norelli v. HTH Corp.*,
  699 F. Supp. 2d 1176 (D. Haw. 2010) ....................................43

*Northeast Center for Rehabilitation*,
  372 NLRB No. 35 (2022) .........................................................29

*Overstreet v. Absolute Healthcare*,
  2022 WL 2275667 (D. Ariz. June 23, 2022) .......................35, 41

*Overstreet v. David Saxe Prods., LLC*,
  2019 WL 332406 (D. Nev. Jan. 24, 2019) .....................40, 41, 43

*Overstreet v. El Paso Disposal, L.P.*,
  625 F.3d 844 (5th Cir. 2010) ...................................................42

*Overstreet v. One Call Locators Ltd.*,
  46 F. Supp. 3d 918 (D. Ariz. 2014) ....................................36, 43

*Overstreet v. Shamrock Foods Co.*,
  679 F. App'x 561 (9th Cir. 2017) ............................................35

*Pascarell v. Vibra Screw, Inc.*,
  904 F.2d 874 (3d Cir. 1990) ....................................................38

*Paulsen v. PrimeFlight Aviation Servs., Inc.*,
  718 F. App'x 42 (2d Cir. 2017) ...............................................43

*Portland Willamette Co. v. NLRB*,
  534 F.2d 1331 (9th Cir. 1976) .................................................36

*Power Inc. v. NLRB*,
  40 F.3d 409 (D.C. Cir. 1994) ...................................................38

*Pye v. Excel Case Ready*,
  238 F.3d 69 (1st Cir. 2001) .............................................. Passim

*Radio Officers' Union of Commercial Telegraphers Union v. NLRB*,
  347 U.S. 17 (1954) ............................................................34, 40

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) .........................................................19, 37

*Rubin v. Vista del Sol Health Services, Inc.*,
  2015 WL 306292 (C.D. Cal. Jan. 22, 2015) .............................43

*Rubin v. Vista Del Sol Health Servs., Inc.*,
  80 F. Supp. 3d 1058 (C.D. Cal. 2015) .....................................37

*Schaub v. W. Mich. Plumbing & Heating, Inc.*,
  250 F.3d 962 (6th Cir. 2001) .........................................35, 40, 41

*Scott v. Stephen Dunn & Assocs.*,
  241 F.3d 652 (9th Cir. 2001) ........................................... Passim

*Shamrock Foods Co.*,
  366 NLRB No. 117 (2018) ...............................................18, 27

*Sharp v. Webco Indus., Inc.*,
  225 F.3d 1130 (10th Cir. 2000) ..................................................................35, 41
*Shattuck Denn Mining Corp. v. NLRB*,
  362 F.2d 466 (9th Cir. 1966) .............................................................................31
*Silverman v. Whittall & Shon, Inc.*,
  1986 WL 15735 (S.D.N.Y. June 6, 1986) ..................................................39, 41
*Small v. Avanti Health Sys., LLC*,
  661 F.3d 1180 (9th Cir. 2011) .................................................................. Passim
*Stevens Creek Chrysler Jeep Dodge, Inc.*,
  357 NLRB 633 (2011).........................................................................................17
*United Nurses Assocs. of Cal. v. NLRB*,
  871 F.3d 767 (9th Cir. 2017) ............................................................................43
*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ...........................................................................................13
*Walmart, Inc.*,
  339 NLRB 1187 (2003)......................................................................................22
*Walsh v. Mountain View Care and Rehab. Ctr., LLC*,
  2019 WL 2865891 (M.D. Pa. July 2, 2019) ....................................................40
*Willms v. Guard Publ'g Co.*,
  25 F. App'x 620 (9th Cir. 2002) .......................................................................35
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................................12, 13
*Wright Line*,
  251 NLRB 1083 (1980)...............................................................................28, 29

Statutes

29 U.S.C. § 151 ........................................................................................................34
29 U.S.C. § 157 ..................................................................................................18, 34
29 U.S.C. § 158(a)(1) ...................................................................................... Passim
29 U.S.C. § 158(a)(3) ...................................................................................... Passim
29 U.S.C. § 160(j)...............................................................................................1, 11

## I.      INTRODUCTION

Respondent Lucid USA, Inc. (Respondent) has repeatedly violated the National Labor Relations Act (the Act) by waging a multipronged campaign to frustrate its employees' legally protected efforts to unionize. Having discovered its employees' efforts at the very outset of organizing in January 2023, Respondent wasted no time putting employee organizers Amie Hansen (Hansen) and Chad Brewer (Brewer) under surveillance, confiscating union literature from non-working areas of the plant, soliciting grievances from potential union-supporters on the factory floor, and offering a supervisory position to Hansen to get her to abandon her efforts. When Hansen refused a supervisory position, she was instead transferred to another location in the plant, isolating her from her fellow employee organizer Brewer. While Hansen was sequestered, Respondent discouraged Brewer from talking to her. When Hansen's transfer failed to slow the organizing campaign's progress, Respondent fired both Hansen and Brewer, effectively quashing the nascent union campaign within weeks of its inception.

Each of these actions is a flagrant violation of the Act, but Respondent nonetheless stands poised to reap the benefits of its unlawful actions. Although the Regional Director of Region 28 (Petitioner) has issued complaint on these allegations, and hearing is scheduled for October 9, 2024, the reality is that enforcement of a final National Labor Relations Board (Board) Order is years away, and by that time the employees' campaign will be beyond revival. Therefore, to prevent irreparable harm to employees' rights and the Board's remedial powers, Petitioner respectfully asks that this Court issue a preliminary injunction to enjoin Respondent from further violations pending Board

adjudication of the complaint, to require Respondent to offer interim reinstatement to Hansen and Brewer, and to publicly post and read this Court's Order to notify employees of the Court's protection of their rights.

## II.     STATEMENT OF FACTS

### A.  Respondent's Operations and Timeclock Procedures

The Respondent is a manufacturer of electric vehicles with a manufacturing plant (the "facility" or "plant") in Casa Grande, Arizona. PX 4 at 2-3. Hansen and Brewer both worked in an area of the plant called "battery pack" within the powertrain department. PX 5 at 3; PX 6 at 1-2.

When Hansen and Brewer started working for Respondent, in 2021 and 2022, respectively, they were instructed to download the Ultimate Kronos Group ("UKG") mobile app on their personal smartphones to clock in and out of work. PX 5 at 3; PX 6 at 1-2. Because employees are required to wear special, fire retardant personal protective equipment (PPE), they were given about 30 minutes before and 15 minutes after their shifts to change. PX 5 at 3; PX 6 at 3. Instead of using the small, congested bathrooms, many employees would clock in when they were in the parking lot and then change in their cars before entering the plant. PX 5 at 4; PX 6 at 2. Additionally, the app often had glitches and would not properly load, causing occasional late clock outs. PX 6 at 8. In fact, Brewer had brought to management's attention these clocking in/out procedures and was not told to do it any differently. PX 6 at 8.

2

### B.  Respondent Immediately Opposes Employees' Nascent Organizing Campaign

At the beginning of 2023,[1] an organizing campaign commenced at the plant after Brewer reached out to the United Auto Workers (the Union) on January 17. PX 6 at 4; PX 7, Attachment A at 2. On about January 24, a Union organizer met virtually with Brewer, Hansen, and about seven to ten other employees over Zoom and provided attendees with flyers to post and distribute in the facility. PX 5 at 7-8; PX 6 at 4; PX 7 at 2-3. The flyers said, "Let's improve our working conditions at Lucid. Fill out the survey," and "Tired of your working conditions? You're not alone!" PX 7 at 2-3; PX 10.  The flyers contained a scannable QR code that led to a survey form with the UAW logo prominently displayed at the top of the webpage where employees could enter their concerns about job issues. PX 7 at 2-3; PX 11.

Starting January 25, lead Union activists Brewer and Hansen distributed and posted those flyers daily in the plant bathrooms and break rooms. PX 5 at 8; PX 6 at 4. Various Employer officials, including Human Resources Partner Tiffany Lopez (Lopez), Managers Miguel Paredes (Paredes), and Supervisor Layton Ratliff (Ratliff) observed the distribution of the flyers and repeatedly removed them. PX 5 at 11; PX 12 at 8, 108, 110, 112. Although Respondent denies knowing that the flyers were related to employees' efforts to unionize, Respondent admits that Ratliff turned the confiscated flyers into Human Resources. PX 12 at 8, 112.

---

[1] All subsequent dates are in 2023 unless otherwise noted.

Shortly thereafter, both Brewer and Hansen noticed an increased supervisor presence around them. For example, Manager Steele began shadowing Brewer, suddenly taking his breaks at the same time, and even following Brewer outside when he went to smoke. PX 6 at 4-5. When Brewer directly asked if Steele was following him, Steele denied it. PX 6 at 5. However, even supervisor Ratliffe acknowledged that Steele was watching Brewer. PX 6 at 6.

Similarly, on January 25, when Hansen and another employee were off the clock in the break room discussing the Union, Manager Steele kept walking by the two women and lingered in front of the refrigerator near them, within earshot of their conversation, repeatedly opening and closing the refrigerator's door without putting anything in it or taking anything out. PX 5 at 9. The next day, January 26, Manager Paredes approached Hansen and asked what she was looking for at the company. PX 5 at 9. Hansen expressed that she wanted more money, and Paredes first offered her a night shift supervisor position, but when she declined because of familial obligations, he offered her a different position that paid $2.50 more per hour in a significantly smaller, secluded department of the facility (bonders). PX 5 at 9-10. Hansen accepted the promise of higher pay and soon started the new position that separated her from the majority of workers she and Brewer were trying to organize. PX 5 at 10.

On January 31, Brewer accepted an invitation to meet with Manager Steele and Supervisor Ratliff about how they could improve morale at the plant. PX 6 at 5-6. The 45-minute meeting took place in the open, near where some employees were taking their breaks and others were walking by. PX 6 at 5. Steele and Ratliff asked Brewer what

4

could be done better at the plant. PX 6 at 5. Brewer directly discussed the organizing campaign with them, explaining employees' concerns, such as scheduling, parking, hazard pay, and communication issues with management. PX 6 at 5-6.

Soon thereafter, a representative from Respondent's Human Resources Department (HR) began walking around the plant floor introducing himself to employees. PX 6 at 6. After introducing himself to Brewer, the HR representative told Brewer that if he had questions about anything, or if there was anything that he wanted addressed, Brewer should come to him. PX 6 at 6.

During the first week of February, Brewer went to talk to Hansen in her new department while on break. PX 6 at 6. After a few occasions, Supervisor Ratliff, who had been observing them during their visits, reminded Brewer that he was being watched by Manager Steele, but when Brewer brushed off the warning, Ratliff further admonished Brewer that he could not be there, that Brewer knew that they were watching him, and that Brewer would get in trouble if he remained. PX 6 at 6.

On February 3, the Union held another organizing meeting that about 12 to 15 employees attended. PX 5 at 10; PX 6 at 7; PX 7 at 4. The Union held a meeting the next day for employees who could not attend the February 3 meeting, and another employee participated. PX 7 at 5. By this time, about 35 employees had filled out a survey in support of the Union that they had accessed through the QR code on the Union flyers distributed throughout the facility. PX 7 at Attachment B.

### C. Respondent Discharges Lead Union Activists Hansen and Brewer

On February 6, Hansen and Brewer passed out new flyers in the lunch area, which more clearly spoke to the employee-driven campaign by adding, "For us, by us. This is not a company survey. We are workers, just like you." PX 5 at 11; PX 6 at 7; PX 10 at 2. Hansen left a stack of flyers on her workstation table that day next to her drink and witnessed employees looking at them. PX 5 at 11.

On February 7, Respondent discharged Hansen and Brewer for allegedly violating its policy against falsifying timecards that it discovered through a non-routine audit by HR. PX 12 at 4-6, 103-104. For an undisclosed reason, and on an undisclosed date in January, HR representatives, including HR Partner Lopez, were instructed to review timekeeping records at the plant. PX 12 at 103-104. Although Respondent noted that at some point in January, Senior Vice President Steven David issued a prospective directive to HR to address issues with absenteeism using discipline and eventually termination, it does not cite this directive as the reason for the retroactive audit at the plant. PX 12 at 105. On January 26 (when the flyer distribution began), Respondent audited Hansen's and presumably Brewer's time records. PX 12 at 105.

As there was no established process for this unprecedented audit or a single source of data to review, HR Partner Lopez did not review time records for *all* employees, but rather, according to a declaration provided by Respondent during the administrative investigation of this matter, selected between two and six employees under each supervisor at Lopez's discretion during November 2022 and January 2023 (omitting December 2022), and compared badge swipes to clock in/out times. PX 12 at

105. According to Lopez's purported randomized audit, Brewer and Hansen were the only employees identified who had timecard violations. PX 12 at 105.

HR Partner Lopez's audit found that Hansen had clocked in on her phone before she physically entered the facility for 14 shifts in November 2022, and 4 shifts in January 2023, and that she also clocked out two hours after physically exiting the building on November 8, 2022. PX 12 at 105. (Notably, November 8, 2022, was the date of the last General Election, and Respondent's CEO had announced that employees could be given two paid hours to vote and that everyone was released early at 4:00 PM.) PX 5 at 12-13; PX 12 at 5, 107. Similarly, Lopez's audit found that Brewer clocked in from his phone before physically entering the facility for 12 shifts in November 2022 and 11 shifts in January 2023, and clocked out "late" on his phone after physically exiting the building on 12 separate occasions in November 2022 (including on November 8, 2022), and 3 in January 2023.[2] PX 12 at 5.

On February 7, Hansen and Brewer explained to Lopez when they met with her individually that they believed they were permitted to remotely clock in for work on their smartphones in the parking lot and change in their cars prior to entering the plant, and then change after having left the plant and clock out in the parking lot. PX 5 at 12;

---

[2] Although Respondent alleged that Brewer clocked out "late," the records show that for 13 of the 15 incidents alleged, there was never more than 11-minutes between Brewer's last badge swipe in the building and his clock-out time, which is well within the 15-minute window for changing. Of the remaining two incidents, one involved the 2-hour early release on election day, and the other involved a 1-hour and 23-minute difference on January 4, between Brewer's last badge reading in the building at 12:37 PM, and his clock out at 2:00 PM. *See* PX 12 at 45-66.

PX 6 at 8; PX 12 at 106. Concerning November 8, 2022, they had been told they were released early and would be compensated for two hours to vote in the election. PX 5 at 12; PX 6 at 8; PX 12 at 6, 107.

Regarding their late clock-outs to vote on November 8, 2022, Respondent (through Lopez's declaration) contends that employees were to submit paid leave requests for up to two hours (rather than leaving work early and clocking out two hours later as Hansen and Brewer did), *only if* they did not have sufficient time outside of working hours to vote. PX 12 at 107. Lopez concluded that Hansen and Brewer had sufficient time to vote outside working hours (without knowing their voting districts, polling schedules, wait times, etc.) and ignored that all the employees had been released early so they could vote on election day. Lopez further rejected Hansen and Brewer's assertion that it was the widespread practice for employees to clock in using their smartphones and change in their cars, stating that employees were to physically enter the facility and clock in for work using the physical time clocks in the building, and then, only once inside are they to change into and out of PPE, despite the lack of actual changing rooms. PX 12 at 106-107; PX 5 at 4. Respondent failed to explain how it could have processed payroll from the UKG mobile app after its use had allegedly been discontinued or specify when it transitioned exclusively to physical Kronos time clocks inside the facility.

Respondent claims that it treated Hansen and Brewer as it has treated all employees, providing three examples as comparator evidence. PX 12 at 9. Initially, Respondent identified an employee it discharged on February 10 for stealing almost 30

hours of working time over the course of three days in January. PX 12 at 99. On one of those days, this first employee remotely clocked in/out from his smartphone without physically showing up for work at all, and when questioned by Respondent, admitted that he was not at the plant that day. PX 12 at 99. Respondent also identified a second employee to whom it had issued a written warning on February 26 when the employee had been found sleeping in his car during his shift. PX 12 at 101. Respondent merely coached the employee. PX 12 at 101. Respondent identified a third employee to whom it had issued a written warning on March 4 for timecard falsification when she clocked in "outside the geofence area" and did not report being late to her supervisor.[3] PX 12 at 102. Notably, the date of this comparator would fall mere days after Respondent was served with the initial charge in this case, Board Case 28-CA-313086, on March 1. PX 3 at 1. Respondent has not explained why, as with the latter two examples, it did not first issue discipline short of discharge to Hansen or Brewer, neither of whom had a history of prior misconduct. Instead, Hansen and Brewer were discharged the day following their open distribution of union literature.

### D.  Impact of the Unlawful Discharges on the Organizing Campaign

Soon after Hansen and Brewer were discharged, a coworker texted Brewer that all the employees were "scared shitless" by the discharges. PX 7 at 5; PX 9. This was also

---

[3] Although Respondent asserts that it had ceased using the UKG app and transitioned exclusively to physical Kronos time clocks inside the facility by the time Hansen and Brewer were discharged, this comparator disproves that claim as the employee was able to clock in before "entering the grounds" using the mobile app.

reflected by Union meeting attendance, which dropped markedly. At a Union meeting held on February 8, only two or three employees attended. PX 7, Attachment A at 6.

About February 8, the Union called each of the 35 employees who had expressed interest in organizing by filling out surveys in January and February to gauge their interest. PX 7 at 2. Some employees told the Union they needed to keep their jobs, so they were no longer willing to help the organizing effort, while others explicitly referenced Hansen and Brewer's terminations as the reason for their lack of interest. PX 7 at 2-3. In March, Union representatives followed up by contacting its list of employees who had initially shown interest but found that support for the campaign was still dismal. PX 8 at 1-2. Union representatives continued to follow up, including a few months later in the summer. However, nearly all the employees the Union called said they were not willing to be involved anymore. PX 8 at 2.

Although the organizing effort in late January and early February was frustrated by the discharges of lead Union activists Hansen and Brewer, renewed interest was sparked in about December 2023 after the Union announced efforts to organize autoworkers across the country. PX 8 at 3. Since then, while some of Respondent's employees reached out to the Union to sign authorization cards, no employees have been willing to spearhead organizing efforts within the facility or participate on an organizing committee as Hansen and Brewer had. PX 8 at 3-4.

1

2

## III.   STATUTORY SCHEME PURSUANT TO WHICH INJUNCTIVE RELIF IS SOUGHT: THE APPLICABLE STANDARDS

3

4

5

6

7

8

9

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions that are "just and proper" pending the Board's resolution of unfair labor practice proceedings. 29 U.S.C. § 160(j).[4] Congress recognized that the Board's administrative proceedings are often protracted. In many instances, absent interim relief, a respondent could "accomplish[] [its] unlawful objectives before being placed under any legal restraint."[5]

10

11

12

13

14

In the Ninth Circuit, district courts rely on traditional equitable principles to determine whether § 10(j) interim relief is appropriate.[6] Under these principles, to obtain a preliminary injunction, the Petitioner must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of

15

16

[4] Section 10(j) [29 U.S.C. § 160(j)] provides:

17

18

19

20

The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

21

22

23

[5] *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 659 (9th Cir. 2001) (quoting S. Rep. No. 105, 80th Cong., 1st Sess. at 8, 27 reprinted in 1 Leg. Hist. 414, 433 (LMRA 1947)) (abrogated on other grounds, as recognized by *McDermott v. Ampersand Publishing, LLC*, 593 F.3d 950, 957 (9th Cir. 2010)).

24

25

[6] *Coffman v. Queen of the Valley Med. Ctr.*, 895 F.3d 717, 725 (9th Cir. 2018); *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (*Frankl I*).

26

preliminary relief; (3) that the balance of equities tips in the Board's favor; and (4) that an injunction is in the public interest.[7] These elements are evaluated on a "sliding scale" in which the required showing of likelihood of success decreases as the showing of irreparable harm increases.[8] When "the balance of hardships tips sharply" in the Petitioner's favor, the Petitioner may establish only that "serious questions going to the merits" exist.[9] Of course, the Petitioner must always establish "a likelihood of irreparable injury and that the injunction is in the public interest."[10] The "serious questions" standard permits the district court to grant an injunction where it "cannot determine with certainty that the [Petitioner] is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction."[11]

"The court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."[12]

---

[7] *Frankl I,* 650 F.3d at 1355 (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

[8] *See Alliance for the Wild Rockies v. Cotrell,* 632 F.3d 1127, 1131-1135 (9th Cir. 2011).

[9] *Id*. at 1135.

[10] *Id.*

[11] *Id.* at 1133 (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

[12] *Frankl I,* 650 F.3d at 1355 (quoting *Scott*, 241 F.3d at 661).

12

1

### A.  Likelihood of Success on the Merits

2

Showing a likelihood of success in a § 10(j) proceeding "is a function of the

3

probability that the Board will issue an order determining that the unfair labor practices

4

alleged by the Regional Director occurred and that [the Ninth Circuit] would grant a

5

petition enforcing that order."[13] In evaluating the likelihood of success, "it is necessary to

6

factor in the district court's lack of jurisdiction over unfair labor practices, and the

7

deference accorded to NLRB determinations by the courts of appeals."[14]

8

9

Unlike in the underlying administrative proceeding, the Petitioner need not

10

prove by a preponderance of the evidence that the respondent committed the alleged

11

unfair labor practices.[15] Such a standard would "improperly equat[e] 'likelihood of

12

success' with 'success.'"[16] Rather, the Petitioner need only produce "some

13

evidence" in support of the unfair-labor-practice charge "together with an arguable

14

legal theory."[17] Therefore, the district court should sustain the Petitioner's factual

15

allegations if they are "within the range of rationality" and, "[e]ven on an issue of

16

law, the district court should be hospitable to the views of the [Petitioner], however

17

18

19

---

[13] *Frankl I*, 650 F.3d at 1355. *See also Small*, 661 F.3d at 1187.

20

[14] *Frankl I*, 650 F.3d at 1356 (quoting *Miller v. Cal. Pac. Med. Cir.*, 19 F.3d 449, 460 (9th Cir. 1994) (*en banc*), abrogated on other grounds by *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

21

22

[15] *See Scott*, 241 F.3d at 662.

23

[16] *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981).

24

[17] *Coffman,* 895 F.3d at 725 (internal citations and quotations omitted); *Small,* 661 F.3d at 1187 (quoting *Frankl I,* 650 F.3d at 1356).

25

26

13

novel."[18] "A conflict in the evidence does not preclude the Regional Director from

making the requisite showing for a section 10(j) injunction."[19] Indeed, the district

court should *refrain* from resolving credibility conflicts in the evidence.[20]

**B.  Irreparable Harm, Balancing the Equities, and the Public Interest**

In applying traditional equitable principles to a § 10(j) petition, courts must

consider the matter in light of the underlying purpose, which is "to protect the

integrity of the collective bargaining process and to preserve the Board's remedial

power while it processes the charge."[21] In evaluating the likelihood of irreparable

harm to the Act's policies and in considering the balancing of equities, district

courts must "take into account the probability that declining to issue the injunction

will permit the allegedly unfair labor practice to reach fruition and thereby render

meaningless the Board's remedial authority."[22]

The likelihood of irreparable injury is established in a § 10(j) case by

showing "a present or impending deleterious effect of the likely unfair labor practice

---

[18] *Frankl I*, 650 F.3d at 1356.

[19] *Scott*, 241 F.3d at 662.

[20] *Bloedorn v. Francisco Foods*, 276 F.3d 270, 287 (7th Cir. 2001) ("[t]he district judge heard no testimony himself, and consequently had no occasion to assess the credibility of witnesses or to resolve conflicts in the evidence") (citing *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 n. 15 (7th Cir.1996)).

[21] *Miller*, 19 F.3d at 459-60.

[22] *Id*. at 460 (relying on *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987)). *See also Small*, 661 F.3d at 1191; *Frankl I*, 650 F.3d at 1362.

that would likely not be cured by later relief."[23] The Petitioner makes the requisite showing of likely irreparable harm either through evidence that such harm is occurring (*see, e.g.*, *Scott*, 241 F.3d at 667, 668), or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available." *Frankl I,* 650 F.3d at 1362. The "same evidence and legal conclusions" establishing likelihood of success, together with "permissible inferences regarding the likely interim and long-run impact of the likely unfair labor practices," provide support for a finding of irreparable harm.[24] Furthermore, "a likelihood of success as to a § 8(a)(3) [29 U.S.C. § 158(a)(3)] violation with regard to union activists that occurred during . . . an organizing drive largely establishes likely irreparable harm, absent unusual circumstances."[25]

The public interest in a § 10(j) case "is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge."[26] There is also a public interest in protecting "the integrity of the collective

---

[23] *Frankl I,* 650 F.3d at 1362.

[24] *Small,* 661 F.3d at 1195-96 (quoting *Frankl I,* 650 F.3d at 1363) (internal quotation marks omitted).

[25] *Frankl I,* 650 F.3d at 1363 (reaffirmed in *Hooks v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1116 (9th Cir. 2022)).

[26] *Frankl I,* 650 F.3d at 1365 (quoting *Miller,* 19 F.3d at 460).

bargaining process."[27] "Moreover, the public interest favors applying federal law

correctly."[28]

## IV.   INJUNCTIVE RELIEF IS APPROPRIATE IN THIS MATTER

Without § 10(j) injunctive relief in this matter, there is a serious threat of remedial

failure. In response to employees exercising their right to organize under federal law,

Respondent acted swiftly to quash the effort including by removing the lead organizers

from its workforce. As a result, employees' efforts were stifled as initial supporters fear

losing their livelihoods as Hansen and Brewer did. As discussed below, equitable

principles tip sharply in Petitioner's favor in seeking injunctive relief in this matter.

### A. Petitioner's Affidavits and Exhibits Demonstrate a Substantial Likelihood of Success on the Merits

Ninth Circuit precedent clearly states that in evaluating the "likelihood of success"

prong, a petitioner carries the "burden if he can produce some evidence to support the

unfair labor practice charge, together with an arguable legal theory."[29] Here, the

Complaint issued by Petitioner in the underlying administrative proceeding is founded

upon the facts described above and contained within the documents supporting this

Petition, as well as the case law described below. Petitioner has concluded that

---

[27] *Bloedorn*, 276 F.3d at 300 (internal citations omitted). *See also*, *Pye v. Excel Case Ready*, 238 F.3d 69, 75, n.11 (1st Cir. 2001) ("§ 10(j) injunctive relief is designed to protect the public interest in the collective bargaining process").

[28] *Small*, 661 F.3d at 1197 (quoting *N.D. v. Haw. Dep't. of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest.")).

[29] *Frankl I*, 650 F.3d at 1336; *Frankl v. HTH Corp. (Frankl II)*, 693 F.3d 1051, 1062 (9th Cir. 2012).

Respondent violated Section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3), by discharging two leading union activists shortly after organizing efforts commenced. In addition to these "hallmark"[30] violations, Petitioner has also concluded that Respondent engaged in numerous other violations of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), that further interfered with, restrained, and coerced employees in the exercise of their federally protected rights. The evidence supporting these allegations and the instant Petition, as discussed below, presents a strong factual showing that Petitioner will prevail on the merits in the underlying administrative proceedings.

1. **Petitioner Has Shown a Substantial Likelihood of Success on the Allegations that Respondent Has Interfered with Employees' Rights in Violation of Section 8(a)(1) of the Act**

There is a strong likelihood of showing that Respondent repeatedly violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), between late January and early February when, in response to the nascent organizing campaign, it engaged in various activities that have the tendency to interfere with, coerce, or restrain employees in the exercise of their right to self-organization.[31]

It is well settled that the test of interference, restraint, and coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or on

---

[30] Hallmark violations are those considered by the Board to be "particularly coercive because of their tendency to destroy election conditions, and to persist for longer periods of time than other unfair labor practices." *Evergreen Am. Corp.*, 348 NLRB 178, 180 (2006) *enf'd* 531 F.3d 3212 (4th Cir. 2008). Discharging leaders of an organizing effort is considered of the "most flagrant" hallmark violations. *Stevens Creek Chrysler Jeep Dodge, Inc.*, 357 NLRB 633, 638 (2011).

[31] 29 U.S.C. § 158(a)(1) (Section 8 (a)(1) of the Act) makes is an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights under 29 U.S.C. § 157 (Section 7 of the Act).

whether the coercion succeeded or failed. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act.[32]

As discussed more fully below, Petitioner has shown a substantial likelihood of success in proving that Respondent violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by: (1) removing and confiscating employees' Union literature[33]; (2) surveilling employees' Union activities and otherwise creating the impression that employees' protected activity was under surveillance;[34] (3) soliciting employees' grievances while implicitly promising to remedy them to discourage Union support;[35] (4) offering lead Union activist Hansen promotional opportunities to discourage Union support;[36] (5) threatening lead Union activist Brewer with unspecified reprisals if he

---

[32] *American Tissue Corp.*, 336 NLRB 435, 441-42 (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946).

[33] *See, e.g., Eastex, Inc. v. NLRB*, 437 U.S. 556, 570-72 (1978) (employer could not prevent employees from distributing literature in nonworking areas of employer's property during nonworking hours).

[34] *See, e.g., California Acrylic Industries, Inc. v. NLRB*, 150 F.3d 1095, 1099-1100 (9th Cir. 1998) (unlawful surveillance); *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at 1-2 & n.7 (2018) (creating the impression of surveillance), *enforced*, 779 F. App'x 752 (D.C. Cir. 2019).

[35] *See, e.g., California Gas Transp., Inc. v. NLRB*, 507 F.3d 847, 856 (5th Cir. 2007) (surveillance, promises of benefits, and threats of reprisal).

[36] *See, e.g., Great Lakes Warehouse Corp.*, 330 NLRB 807, 807 n.1 (2000) (offer of supervisory position unlawful), *enforced*, 239 F.3d 886 (7th Cir. 2001); *MPC Restaurant Corp. v. NLRB*, 481 F.2d 75, 77 (2d Cir. 1973) (pay increases and changes to working conditions).

continued to engage in protected activity;[37] and, (6) instructing Brewer to refrain from organizing activity.[38]

### a.  Confiscating Employees' Union Literature

Employees have the right to distribute union organizational literature in nonworking areas during nonworking time.[39] An employer unlawfully interferes with that right by confiscating union literature distributed by employees in nonworking areas absent a legitimate basis.[40] Here, employees distributed union related flyers in various nonworking areas including the break rooms and employee restrooms. Consistently, Respondent, through its managers, diligently removed the flyers. Respondent does not deny doing so, but only asserts that it did not know it was union literature. While the flyers may not have had "Union" written on them, the QR code they included led to a webpage with the Union's name and logo prominently displayed. Moreover, after Respondent confiscated and turned these flyers in to Human Resources, a Human Resources representative suddenly started making uncharacteristic visits to the plant

---

[37] *See, e.g., Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000) (employer violated § 8(a)(1) when it told workers not to talk about the union during working hours without a supervisor's approval); *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 934 (D.C. Cir. 2011) (unlawful for an employer to tell an employee "not to talk about the union").

[38] *See, e.g., Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 934 (D.C. Cir. 2011) (unlawful for an employer to tell an employee "not to talk about the union").

[39] *Eastex, Inc. v. NLRB*, 437 U.S. 556, 570-71 (1978); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-803 (1945).

[40] *E.g., Desert Springs Hosp. Med. Ctr.*, 369 NLRB No. 16 (2020) (finding employer violated the Act by confiscating flyers known to be union literature and not for any housekeeping reason); *Manor Care of Easton, PA LLC*, 356 NLRB 202, 204-205 (2010).

floor, introducing himself to employees, and telling them they could go to him if they wanted anything addressed. Depriving employees of their right to communicate with their coworkers by way of union literature absent any legitimate reason to curb the conduct, necessarily interferes with employees' rights to engage in collective action in the workplace – a precursor to democracy in the workplace that the Act is intended to protect. Accordingly, the Court should respectfully find that Petitioner has shown a likelihood of success in showing that Respondent violated Section 8(a)(1) of the Act by confiscating employees' union literature.

### b.  Surveilling Employees' Protected Activity

"The Board has often held that management officials may observe public union activity, particularly where such activity occurs on company premises, without violating Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), unless such officials do something out of the ordinary."[41] Here, as soon as Hansen and Brewer began distributing union literature and discussing unionization with other employees, supervisor Steele started acting out of the ordinary. He followed Brewer around the facility, including outside to the employee smoking area when Brewer took a break. Later, Steele was loitering in the breakroom eavesdropping on Hansen as she spoke with coworkers about the union effort. In an apparent attempt to blend in, he fussed with the refrigerator by opening and closing it multiple times for no apparent reason. As Hansen and Brewer's testimony shows,

---

[41] *Arrow Automotive Industries*, 258 NLRB 860, 860 (1981) (quoting *Metal Industries, Inc.*, 251 NLRB 1523, 1523 (1980) (internal quotations omitted)).

Steele's conduct was out of the ordinary and given the timing – immediately after the open organizing effort ensued – the Board is likely to find that Respondent's conduct had a reasonable tendency to coerce employees in exercising their rights in the workplace in violation of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[42] Accordingly, the Court should respectfully find that Petitioner has shown a likelihood of success in showing that Respondent violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by surveilling employees' protected activity.

### c.  Soliciting Employees' Grievances

An employer's solicitation of grievances chills employees' unionization efforts because it demonstrates both that employees' efforts to unionize are unnecessary and that the employer will only improve working conditions as long as the workplace remains union-free.[43] In other words, it is not the solicitation itself, but the "inference that the employer is promising to remedy the grievances" in light of organizing activity that constitutes coercive conduct.[44] As such, employers with past practices of soliciting

---

[42] *See Durham School Services, L.P.*, 361 NLRB 407, 407 (2014) (finding that supervisor engaged in unlawful surveillance of open union activity by observing employees in a way that was out of the ordinary by patrolling an entrance away from typical station).

[43] *Center Serv. Sys. Div.*, 345 NLRB 729, 730 (2005).

[44] *Id.*; *see also Maple Grove Health Care Ctr.*, 330 NLRB 775, 775 (2000) (affirming that "solicitation of grievances in the midst of a union campaign inherently constitutes an implied promise to remedy the grievances").

employee grievances may continue doing so during a unionization campaign, but not if it "significantly alters its past manner and methods of solicitation."[45]

Here, Manager Parades approached Hansen on January 26 to offer her a supervisory position. When he approached Hansen, he began the conversation by asking her what she wanted from Respondent. Under the circumstances, in which Hansen recently started distributing union flyers, Parades' statement would reasonably be construed as an attempt to elicit information about what was driving the union effort straight from the source.[46] The fact that Hansen revealed she was seeking increased wages and Parades continued by offering her positions that paid more further supports an inference and finding that Parades' question was intended to elicit grievances that Respondent was promising to remedy.

A few days later, supervisor Ratliff and manager Steele met with Brewer and similarly sought information about what was driving the union campaign. Brewer disclosed several issues including scheduling, parking, hazard pay, and communication issues with management. Ratliff's statement to Brewer that he wanted to discuss what could be done to "improve morale" at the facility carries an implied promise to remedy the issues that he had invited Brewer to discuss. This inference of a promise to remedy the grievances is bolstered by Ratliff and Steele's statements that Brewer's ideas were

---

[45] *Walmart, Inc.*, 339 NLRB 1187, 1187 (2003) (relying on *Carbonneau Industries*, 228 NLRB 597, 598 (1977)).

[46] *See, e.g.*, *Horseshoe Bossier City Hotel & Casino*, 369 NLRB No. 80, slip op. at 1 n.9 (2020) (finding that employer unlawfully solicited grievances by asking employees involved in the union campaign what they really wanted).

"good ones," and that management would "look into them." The location of this conversation, out in the open on the production floor as other employees walked by, increases the coercive tendency of these implied promises by passively disseminating the promises to any employee within earshot of the conversation. Given the substantial length of this conversation (45 minutes), it can reasonably be inferred that many employees other than Brewer would have heard Ratliff and Steele saying they would look into the grievances that were driving organizing at the facility.

Accordingly, the Court should respectfully find that Petitioner has shown a likelihood of success in showing that Respondent violated Section 8(a)(1) of the Act by soliciting grievances from employees while promising to remedy them in response to organizing efforts.

### d.  Offering Hansen a Supervisory Promotion

An employer violates Section 8(a)(1) of the Act when, as an inducement to abandon union allegiance it holds out to employees the prospects of promotion to supervisory status.[47] In evaluating the coercive nature of offering a promotion, the Board considers the totality of circumstances including whether the employer had a legitimate need to fill the position, the timing of the offer relative to any union activity by the employee, and any contemporaneous coercive conduct.[48]

---

[47] *Great Lakes Warehouse Corp.,* 330 NLRB 807, 807 n.1 (2000); *Cooke and Jones, Inc.,* 146 NLRB 1664, 1678 (1964).

[48] *See Great Lakes Warehouse Corp.,* 330 NLRB at 807 n.1 (finding that circumstances, including suspect timing, supported a finding that the employer violated Section 8(a)(1) of the Act by offering promotion to induce employee to abandon union).

Here, Paredes offered Hansen a supervisory position on January 26, immediately after Hansen started organizing in the facility and when Steele observed Hansen discussing the effort in the break room with other employees. Respondent has made no showing that it had a legitimate business need to fill a supervisory position. Notably, the nature of the position – night shift and supervisory – would foreseeably preclude Hansen from spearheading the organizing effort and the offer came against the backdrop of other coercive conduct committed by Respondent in the same two-week period as discussed herein. As such, the totality of the circumstances here strongly supports a finding that Respondent's offer to promote Hansen was a coercive inducement to abandon union activities that violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[49] Therefore, respectfully, this Court should find Petitioner has shown a likelihood of success in proving the conduct unlawful.

---

[49] While the offer was coercive in violation of Section 8(a)(1), Respondent also violated Section 8(a)(3) of the Act by granting Hansen a transfer to the higher paying, yet isolated, non-supervisory position in wire bonding (making $2.50 more per hour). Under this section, as discussed more fully below, an employer may not discriminate to encourage or discourage union activity, including by providing better terms and conditions of employment. *See Manno Electric, Inc.*, 321 NLRB 278, 280-281 (1996) (finding that employer violated Section 8(a)(3) by assigning union supporters to work at jobsites where they were isolated from others); *Montgomery Ward*, 290 NLRB 981, 981 (1988) (finding that transferring employee from one department to another violated Section 8(a)(3) because it was an attempt to isolate a union supporter); *Bates Paving & Sealing, Inc.*, 364 NLRB No. 46, slip op. at 2, 2 n.7 (2016) (finding that actual economic harm immaterial to whether violation occurred). Respondent's motive to discourage protected union activity by transferring Hansen is supported by timing, contemporaneous unfair labor practices, and isolated nature of the position.

### e.  Additional Coercive Statements and Conduct

As discussed above, after Hansen transferred to the wire bonding department, Brewer approached the area on about February 1 but was stopped by supervisor Ratliff who told Brewer that he shouldn't be there, that he knows "they" are watching him, and that Brewer would get in trouble. As discussed below, this conduct had a reasonable tendency to coerce employees in violation of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), because it (1) created the impression that employees' protected activity was under surveillance; (2) effectively instructed employees not to engage in protected activity; and (3) threatened employees with unspecified "trouble" for attempting to continue organizing efforts despite Respondent's attempt to separate the ringleaders.

An employer unlawfully creates the impression of surveillance if employees would reasonably assume based on the employer's statement or conduct that "their union activities have been placed under surveillance."[50] Here, Ratliff's statement is effectively the same as the Board found unlawful in *Golden State Foods Corp.*,[51] that Respondent's eyes were on Brewer and that he would get in trouble if he continued. As such, the Board

---

[50] *Flexsteel Industries,* 311 NLRB 257 (1993); *see also Frontier Telephone of Rochester, Inc.,* 344 NLRB 1270, 1276 (2005); *Bridgestone Firestone South Carolina,* 350 NLRB 526, 527 (2007).

[51] *Golden State Foods Corp.*, 340 NLRB 382, 382 n.3 (2003) (finding supervisor's statement that "eyes are on you and you need to watch your step" to pro-union employee created impression of surveillance and violated Act).

is likely to find that in the context of budding union activity, Respondent created the impression that Brewer's protected activity was under surveillance.

Further, employees have a right to solicit other employees to support unionization in working areas, during employees' non-working time, in the absence of special circumstances.[52] Here, Ratliff's statements would likely be construed as an instruction not to engage in protected activity given that Brewer was attempting to contact Hansen – his cohort in the union effort. Instructing employees not to engage in protected activity squarely violates Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[53]

Finally, an unlawful directive or instruction (as discussed above), "can additionally violate Section 8(a)(1) when it is reinforced by an unlawful threat of reprisal" if also reasonably construed as a threat that repercussions from the employer may follow if employees continue to engage in protected activity.[54] Here, Ratliff reinforced his implicit instruction not to engage in protected activity by telling Brewer he would get in trouble for being there. Under the circumstances, an employee would reasonably construe the statement as a threat that Brewer would suffer adverse consequences if he did not stay away from Hansen given the ongoing union effort, or that he would get in trouble for soliciting support for the union in working areas despite the

---

[52] *Harbor Freight Tools USA Inc.*, 373 NLRB No. 2, slip op. at 2 (2023).

[53] *E.g.*, *Cemex Construction Materials Pacific, LLC*, 372 NLRB No. 130, slip op. at 3, n.19 (2023) (finding instruction not to wear union insignia unlawful).

[54] *Desert Springs Hosp. Med. Ctr.*, 363 NLRB 1824, 1825 (2016) (overruled on other grounds).

right to do so. As such, Respondent's threat of "trouble" additionally violated Section

8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).[55] Therefore, respectfully, this Court should find

Petitioner has shown a likelihood of success in showing Ratliff's conduct unlawful.

<blockquote>

**2.** **Petitioner Has Shown a Substantial Likelihood of Success on the Allegations that Respondent Unlawfully Transferred Hansen and Then Discharged both Hansen and Brewer in Violation of Section 8(a)(3) of the Act**

</blockquote>

There is a strong likelihood of success in showing that Respondent violated

Section 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1) and (3), by granting lead

Union activist Hansen a transfer to a higher paying position (that was also more

secluded) to discourage her pro-Union activities,[56] and by discharging employee

organizers Hansen and Brewer on February 7.[57] Section 8(a)(3) of the Act, 29 U.S.C. §

158(a)(3), makes it an unfair labor practice for an employer "by discrimination in

regard to hire or tenure of employment or any term or condition of employment[,] to

encourage or discourage membership in any labor organization." When assessing the

lawfulness of an adverse action that turns on employer motivation, the Board applies

---

[55] *See, e.g., Desert Springs,* 363 NLRB at 1825-26 (finding statement suggesting "trouble" conveyed employee would receive further discipline if he continued to engage in protected activity); *Shamrock Foods Co.*, 366 NLRB No. 117, slip op. at n.10 (finding threat of unspecified reprisal when supervisor warned union organizer he could "get in some serious trouble" for speaking with other employees about union effort).

[56] *See, e.g., Con-Way Freight,* 366 NLRB No. 183, slip op. at 3-4 (2018).

[57] *Frankl II*, 693 F.3d at 1060-61 (enforcing Board order that found employer violated Section 8(a)(3) when employees' union activity was a substantial or motivating factor in the employer's decision to discharge them).

the analytical framework set forth in *Wright Line.*[58] Under *Wright Line*, the General

Counsel must initially show that: (1) the employee engaged in union or other protected

activity, (2) the employer had knowledge of the activity, and (3) the employer

demonstrated animus against union or other protected activity.[59]

   Animus may be established through direct evidence or inferred from

circumstantial evidence on the record as a whole.[60] Circumstantial evidence of

discriminatory motive may include, among other factors: the timing of the action in

relation to the protected activity; contemporaneous unfair labor practices; and evidence

of pretext, such as shifting, false, or exaggerated reasons offered for the action, failure

to conduct a meaningful investigation, departures from past practices, and disparate

treatment.[61] If the General Counsel meets this prima facie burden, the burden of proof

shifts to the employer to demonstrate it would have acted the same regardless of

employees' protected conduct.[62] The employer cannot carry this burden merely by

showing that it had a legitimate reason for the action, but must persuade, by a

preponderance of the evidence, that the action would have taken place absent the

---

[58] *Wright Line*, 251 NLRB 1083 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved by *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 395 (1983).

[59] *Wright Line*, 251 NLRB 1083, 1089 (1980).

[60] *Intertape Polymer Corp*, 372 NLRB No. 133, slip op. at 6-7 (2023).

[61] *Id. See also Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (discussing numerous factors that evidence animus and pretext).

[62] *Wright Line*, 251 NLRB at 1089.

protected activity.[63] Similarly, the employer's burden cannot be satisfied by proffered reasons that are found to be pretextual. Where the reason advanced by an employer for the adverse action either did not exist or was not actually relied on, the inference of unlawful motivation remains intact, and is in fact reinforced by the pretextual reason proffered by the employer.[64]

Here, Hansen and Brewer openly engaged in pro-Union activities at work beginning January 25. Soliciting support for the Union, distributing flyers, and engaging in conversations with coworkers about the union are protected under the Act. Although Respondent asserts it did not know of the organizing campaign until February 10 (three days after the discharges), this is refuted both indirectly by supervisors confiscating and reporting the Union flyers to Human Resources and directly by Brewer discussing with Manager Steele and Supervisor Ratliff the concerns driving employees to seek Union representation, both occurring in late January. Moreover, Respondent's statements and conduct in late January and early February that violated Section 8(a)(1), as outlined above, including Steele's surveillance of Hansen and Brewer's open organizing activity, further belie its claim that it was unaware of any protected activity prior to February 10.[65]

---

[63] *Northeast Center for Rehabilitation*, 372 NLRB No. 35, slip op. at 1-2, n.5 (2022), and cases cited there.

[64] *Intertape Polymer Corp*, supra slip op. at 7.

[65] These circumstances further support a finding of knowledge and animus.

Respondent's anti-Union motive for the two discharges is evidenced by their timing, the presence of contemporaneous unfair labor practices, and Respondent's reliance on a pretext to conceal its true, unlawful motive.[66] First, regarding timing, Respondent discharged the two lead Union activists within two weeks of them beginning to distribute pro-Union literature at the plant. In fact, on *the day before* their discharges, Hansen and Brewer passed out new pro-Union flyers in the lunch area, and Hansen even left a stack on her workstation table. In short, the timing of their discharges creates a strong inference of anti-Union motive.[67] That inference is reinforced by the presence of other unfair labor practices Respondent directed at employees' organizing efforts.

Finally, the evidence strongly supports finding that Respondent used the ad hoc timekeeping audit as a pretext to conceal its actual anti-Union motive for discharging the Union activists.[68] Respondent asserts that it acted non-discriminatorily by treating Hansen and Brewer the same as it did other employees for violating its attendance policy.

---

[66] *See, e.g., Intertape Polymer Corp.,* 372 NLRB No. 133, slip op. at 7, 13 (2023); *Lucky Cab Co.*, 360 NLRB 271, 274 (2014) (noting that timing of and pretextual reasons for adverse personnel actions, and presence of other ULPs, support finding employer had anti-union motive), *enforced*, 621 F. App'x 9 (D.C. Cir. 2015).

[67] *Healthcare Emps. Local 399 v. NLRB*, 463 F.3d 909, 920 (9th Cir. 2006) (timing made inference of anti-union motive "stunningly obvious"); *Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834, 838 (9th Cir. 1981) (timing of discharge was indicia of discriminatory motive).

[68] *See Kapiolani Hosp. v. NLRB*, 581 F.2d 230, 234 (9th Cir. 1978) (discharge unlawful where proffered reason was not the real basis for the decision and the employer disparately enforced rule); *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966) ("Board may infer from the pretextual nature of an employer's proffered justification that the employer acted out of union animus, '*at least where . . . the surrounding facts tend to reinforce that inference.*'") (emphasis in original).

But Respondent did not audit Hansen and Brewer's time records until the day after they first publicly distributed Union flyers, and by its own admission the audit that led to their discharges was unprecedented and non-uniform, all creating the reasonable inference that Respondent initiated the audit to generate a justification for removing the Union activists from its workforce.[69]

Moreover, the comparators Respondent relies on to support its assertion that it acted non-discriminatorily are distinguishable and, in fact, establish its disparate treatment of Hansen and Brewer. The first comparator was an employee Respondent discharged who falsified his time records by remotely clocking in/out and claiming to work numerous hours for which he admitted to not being present at the plant. In contrast, neither Hansen nor Brewer engaged in time theft because Respondent conceded that employees are permitted to change into and out of PPE before and after their shifts while on the clock. Notably, Respondent did not take issue with the first comparator's method of clocking in/out (i.e., with his smartphone), but only with him falsely claiming to have worked his shifts. Furthermore, unlike this comparator, Brewer had never attempted to

---

[69] *See Mondelez Global, LLC*, 369 NLRB No. 46, slip op. at 2-3 (2020) (finding employer's claim it lawfully discharged three vocal union supporters because its study into the reasons for the plant's high overtime costs revealed they had falsified their time records was a pretext; employer's abrupt halt of the study after the discharges, failure to provide the discriminatees an opportunity to respond, and disparate treatment of the discriminatees showed the employer had used the study to provide a reason for discharging them), *enforced*, 5 F.4th 759, 771 (7th Cir. 2021); *National Assn. of Govt. Employees (Intl. Bhd. of Police Officers)*, 327 NLRB 676, 676 n.4, 699-700 (1999) (finding employer violated Section 8(a)(3) and (1) by initiating audit of work expenses charged by lead union activist; employer cannot establish it would have terminated employee regardless of pro-union activities if employer initiated investigation because of those activities), *enforced*, 205 F.3d 1324 (2d Cir. 1999) (table decision).

hide how he clocked in and out for work. Rather, he previously spoke to management about the common practice of employees using their smartphones to clock in/out, but Respondent never instructed Brewer to stop.

The second comparator was an employee who received a coaching by Respondent for sleeping in his car during his shift. In contrast to this second comparator, Hansen and Brewer worked their shifts despite changing their clothing in the parking lot while on the clock. Similarly, the third comparator only received a written warning for clocking in outside of the geofence supposedly after Respondent ceased its use of the UKG mobile app. Respondent's leniency toward the second and third comparators serves to highlight Hansen and Brewer's disparate treatment. Despite Hansen and Brewer having no disciplinary history, neither was afforded the opportunity to be coached or given a written warning.[70] Moreover, this appears to be in contravention of Respondent's policies given that the directive Respondent pointed to from the Senior Vice President mentioned using discipline before resorting to termination.

As for Hansen and Brewer's late clock-outs on November 8, 2022, the date of the last General Election, Respondent had informed its plant employees that they would receive two hours paid leave to vote and were released early at 4:00 PM, which is why Hansen and Brewer left around that time and clocked out two hours later. Respondent

---

[70] Thus, assuming Brewer had been absent for 1-hour and 23-minutes on January 4, Respondent's leniency with the second comparator, who slept during his shift, provides evidence of disparate treatment showing that its asserted reason for discharging Brewer was a pretext to cover its anti-Union motive. Likewise, Respondent's continued showing of leniency with the third comparator, even after changing its timekeeping policy further supports the inference that Respondent targeted Hansen and Brewer.

asserts that the two paid hours should have been entered as paid leave requests instead of time worked, however, because of Respondent's grant of two hours leave, the practical effect was merely a coding difference. Moreover, HR Partner Lopez's conclusion that Hansen and Brewer were not entitled to two hours paid voting time because they had sufficient time to vote on non-work time is unsupported and fails to acknowledge that all employees were released early on election day, reinforcing the inference that Respondent singled them out because of their pro-Union activities.

In sum, Petitioner is likely to succeed in showing that (1) Hansen and Brewer were engaged in protected union activity; (2) Respondent knew of Hansen and Brewer's efforts to organize; and (3) that Hansen and Brewer's protected activity was a motivating factor in their discharge. When Petitioner has met its initial burden by showing these three elements, the burden of persuasion shifts to Respondent. Due to the suspect timing of the discharges, the contemporaneous unfair labor practices, and strong evidence that Respondent punished other employees less severely, Respondent likely cannot show that it would have discharged Hansen or Brewer absent their protected activity. Therefore, Petitioner is likely to prevail on the merits in the underlying administrative proceeding before the Board. Having established a strong likelihood of success, Petitioner turns now to whether interim relief is just and proper in this case.

**B. Interim Relief is Just and Proper to Prevent Irreparable Harm to the Employees' Statutory Rights and to Protect the Efficacy of the Board's Final Order**

Congress has declared that "encouraging . . . collective bargaining" is the "policy of the United States."[71] Section 7 of the Act grants employees the decision "to bargain collectively through representatives of their own choosing."[72] Making that choice "without restraint or coercion by their employer" is a "fundamental right."[73] Without timely interim injunctive relief, including offering interim reinstatement to the two unlawfully discharged Union activists, Respondent's illegal actions will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power. In short, Respondent will forever benefit from its illegal conduct.

**1. Interim Reinstatement Offers to Hansen and Brewer are Just and Proper to Preserve the Employees' Free Choice to Continue the Organizing Campaign**

Many courts, including the Ninth Circuit and district courts therein, have recognized that the discriminatory discharge of union supporters can effectively end an

---

[71] 29 U.S.C. § 151.

[72] 29 U.S.C. § 157. *See NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 397 (1983) ("Employees of an employer covered by the NLRA have the right to form, join, or assist labor organizations.").

[73] *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 33 (1937). *See also NLRB v. Gen. Teamsters Local No. 439, Int'l Bhd. of Teamsters, AFL-CIO,* 175 F.3d 1173, 1175 (9th Cir. 1999) (quoting *Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 40 (1954)) ("holding that '[t]he policy of the Act is to insulate employees' jobs from their organizational rights'").

34

organizing campaign absent interim injunctive relief.[74] Immediately, the unlawful

termination of union activists can create a leadership void sufficient to derail a

campaign.[75] Moreover, the remaining employees, especially those who were undecided

about organizing, will often refrain from supporting the union for fear of also losing their

jobs.[76] Accordingly, multiple Courts of Appeals, including the Ninth Circuit, have

endorsed inferences of irreparable harm based on unlawful terminations alone.[77] The risk

---

[74] *Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1363 (9th Cir. 2011); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988), *overruled on other grounds*, *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (en banc); *Overstreet v. Shamrock Foods Co.*, 679 F. App'x 561, 566 (9th Cir. 2017), *affirming* 2016 WL 8505125, at *5-6 (D. Ariz. Feb. 1, 2016); *Willms v. Guard Publ'g Co.*, 25 F. App'x 620, 622 (9th Cir. 2002), *affirming* 2001 WL 34038572 (D. Or. May 1, 2001); *Overstreet v. Absolute Healthcare*, 2022 WL 2275667, at *7 (D. Ariz. June 23, 2022). *See also Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000); *Pye v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001); *Electro-Voice*, 83 F.3d at 1572-73; *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980).

[75] *See Schaub*, 250 F.3d at 971 (without reinstatement of discriminatee, "there would be no one at the company organizing for the union"); *Electro-Voice*, 83 F.3d at 1573 (noting that the discharged organizers' "absence deprives the employees of the leadership they once enjoyed").

[76] *See Frankl I*, 650 F.3d at 1363 ("discharge of active and open union supporters ... risks a serious adverse impact on employee interest in unionization," quoting *Pye*, 238 F.3d at 74); *Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976) ("discharge for participation in union activities" creates "visible and continuing obstacles to the future exercise of employee rights"); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 929 (D. Ariz. 2014) (quoting *Frankl I*); *Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 576 (2d Cir. 1988) ("Employees are certain to be discouraged from supporting a union if they reasonably believe it will cost them their jobs."); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212-13 (2d Cir. 1980) (discharge of union adherents may reasonably "remain in [employees'] memories for a long period"); *Electro-Voice*, 83 F.3d at 1573 ("[T]he employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them.").

[77] *See Frankl I*, 650 F.3d at 1363 ("likelihood of success" in proving discriminatory discharge of union activists during organizing drive "largely establishes" likely

35

of irreparable harm is even more acute where, as here, the employer has engaged in additional illegal conduct to interfere with its employees' organizing efforts, including surveilling their Union activities, soliciting grievances and promising to remedy them to discourage interest in the Union, offering a promotion and granting a transfer to a higher paying job, threatening unspecified reprisals if employees continued to engage in pro-Union activities, and interfering with employees disseminating information about the Union.[78]

---

irreparable harm, absent unusual circumstances); *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967) (independent evidence of irreparable harm not required because illegal discharges during an organizing campaign "operate predictably to destroy or severely inhibit employee interest in union representation, and activity toward that end"). *Cf. Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297-98 (7th Cir. 2001) (interim reinstatement of employees illegally refused hire just and proper even where "the Director chose not to make an independent case on irreparable harm"). The Ninth Circuit recently reaffirmed *Frankl I*'s permissible inference of harm in *Hooks v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1115-17 (9th Cir. 2022) (discussing distinction between permissible inferences of irreparable harm and improper mandatory presumption of harm).

[78] *See, e.g.*, *California Acrylic Industries, Inc. v. NLRB*, 150 F.3d 1095, 1099-1100 (9th Cir. 1998) (unlawful surveillance "creates fear among employees of future reprisal" and "chills an employee's freedom to exercise his section 7 rights"); *Electro-Voice,* 83 F.3d at 1570 (explaining coercive impact of illegal conduct including solicitation of employee grievances, questioning about union activity, and threats); *Great Lakes Warehouse Corp. v. NLRB*, 239 F.3d 886, 890 (7th Cir. 2001) (offers of promotion to management positions can reasonably tend to interfere with or coerce employees in exercising the right of self-organization); *NLRB v. Henry Colder Co.*, 447 F.2d 629, 631 (7th Cir. 1971) (promise of benefits for employees to "forget" union had substantial coercive effect that will "remain in the memory of the employees"); *C & W Super Markets, Inc. v. NLRB*, 581 F.2d 618, 623-24, 626 (7th Cir. 1978) (employer's unfair labor practices, including promises of benefits for siding with management and instructing employees not to engage in union activities, have "lingering effects" that "[will] not soon be dissipated."); *Rubin v. Vista Del Sol Health Servs., Inc.*, 80 F. Supp. 3d 1058, 1083 (C.D. Cal. 2015) (finding employer unlawfully promised an employee improved job security to induce rejection of union) (citing *Fabric Warehouse,* 294 NLRB 189, 191 (1989), *enforced, Hancock Fabrics v. NLRB,* 902 F.2d 28 (4th Cir.1990)); *see also NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409 (1964); *California Gas Transp., Inc. v. NLRB*, 507 F.3d 847, 856 (5th Cir. 2007) (threats of reprisal or discharge for engaging in protected concerted activities "'live on in the lore of the shop and continue to repress employee sentiment. . . .'") (quoting

36

Here, Respondent's illegal conduct devastated the nascent organizing drive. After Respondent unlawfully discharged lead Union activists Hansen and Brewer, employee attendance at Union meetings dropped and they reported being scared of losing their jobs for showing Union support. Although some employees began showing a renewed interest in the organizing campaign in December 2023, none of the original employees who supported the Union before the unlawful discharges have resumed organizing activities, which shows the need for interim injunctive relief.[79] Moreover, none of the newly interested employees have agreed to accept a leadership role for the renewed campaign.[80] In short, Respondent's illegal conduct has chilled some employees from engaging in any pro-Union activity and has coerced others from fully exercising their rights under the Act.[81] Thus, although this is a large unit, it is evident that Respondent's unlawful

_Bandag, Inc. v. NLRB_, 583 F.2d 765, 772 (5th Cir. 1978)); _Beth Israel Hosp. v. NLRB_, 437 U.S. 483, 491 (1978) (freedom of employees to communicate with one another regarding self-organization on jobsite is essential to their rights to self-organize); _Republic Aviation Corp. v. NLRB_, 324 U.S. 793, 801-05 (1945) (same).

[79] _See NLRB v. Ultra-Sonic De-Burring, Inc., of Texas_, 593 F.2d 123, 125 (9th Cir. 1979) (illegal discharge of union organizers during campaign "eliminated the organizational activity of those already committed to the union while serving to warn others of the consequences should they come to the union's support").

[80] _See Frankl I_, 650 F.3d at 1363 (fear of retaliation is "exactly the 'irreparable harm' contemplated by § 10(j)") (quoting _Pye_, 238 F.3d at 74); _Pascarell v. Vibra Screw, Inc._, 904 F.2d 874, 878-79, 881 (3d Cir. 1990) (chilling effect of retaliation against activists cannot be undone by eventual Board order).

[81] _See NLRB v. Link-Belt Co._, 311 U.S. 584, 598 (1941) (discharge of activists during organizing campaign "effectively ...restrain[ed] the employees' choice" and "tend[ed] to have as potent an effect as direct statements to the employees that they could not afford to risk selection of [the union].""); _Power Inc. v. NLRB_, 40 F.3d 409, 423 (D.C. Cir. 1994) (holding Board properly concluded that "it is 'difficult to imagine any act of management better calculated to chill union support'" than illegal discharges); _NLRB v. Longhorn_

discharge of the two lead Union activists had a meaningful impact that warrants their interim reinstatement.[82]

Any continued organizing efforts will be doomed unless Hansen and Brewer are offered immediate interim reinstatement under the protection of an interim injunction, sending a message of reassurance to all employees. "[I]n the labor field, as in few others, time is crucially important in obtaining relief."[83] A final Board reinstatement order at the end of the administrative process cannot revive the unlawfully curtailed employee interest in unionization because it will not come until years after their discharges[84]—too late to erase the chilling effect.[85] By that time, the remaining employees will have seen that Respondent retaliated against workers who "attempted to exercise rights protected by the Act," and then they had to wait for "years to have their rights vindicated."[86] The returning discriminatees will have experienced a prolonged absence from the workplace

---

*Transfer Serv., Inc.*, 346 F.2d 1003, 1006 (5th Cir. 1965) ("the discharge of a leading union advocate is a most effective method of undermining a union organizational effort").

[82] *NLRB v. Ona Corp.*, 605 F. Supp. 874, 886 (N.D. Ala. 1985) (interim reinstatement of single discriminatee in large unit will send "affirmative signal" that employees are free to exercise their Section 7 rights).

[83] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[84] *See, e.g., Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "notoriously glacial" pace of Board proceedings).

[85] *See Pye*, 238 F.3d at 75 (unremedied interference with unionization effort "would make the Board's remedial process ineffective simply because it is not immediate"); *Electro-Voice*, 83 F.3d at 1573 ("As time passes, . . . the spark to organize is extinguished."); *Shamrock Foods Co.*, 2016 WL 8505125, at *6.

[86] *Silverman v. Whittall & Shon, Inc.*, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986).

as a result of engaging in protected activity.[87] At that point, no worker in their "right

mind" will stick their neck out to support the Union.[88] This is exactly the type of

irreparable harm Section 10(j) is designed to address.[89] Furthermore, by the time the

Board can act, Hansen and Brewer will likely have taken other jobs and be unavailable

for reinstatement, itself an irreparable injury to the unionization effort.[90] Thus,

Respondent will succeed in permanently frustrating its employees' right to freely choose

Union representation.[91] The Board's order will be an "empty formality" because it could

no longer restore the lawful status quo of an ongoing organizing campaign that would

have existed but for Respondent's unlawful conduct.[92]

　　　　Requiring Respondent to offer immediate interim reinstatement to lead Union

activists Hansen and Brewer creates the best chance of resuscitating the organizing

---

[87] *See Angle*, 382 F.2d at 660-61 (when the Board finally acts, "the employees then at the plant may not wish to exercise the rights thus secured to them").

[88] *Silverman*, 1986 WL 15735, at *1.

[89] *Pye*, 238 F.3d at 75.

[90] *Id.; accord Aguayo*, 853 F.2d at 749; *Electro-Voice,* 83 F.3d at 1573.

[91] *Cf. Radio Officers' Union*, 347 U.S. at 40 ("The policy of the Act is to insulate employees' jobs from their organizational rights. . . . to allow employees to freely exercise their right to join unions . . . without imperiling their livelihood."); *Jones & Laughlin Steel Corp.,* 301 U.S. at 34 ("collective action would be a mockery if representation were made futile by interference with freedom of choice.").

[92] *Angle*, 382 F.2d at 660.

campaign and avoiding this unjust result.[93] Notwithstanding the chilling impact of

Respondent's egregious conduct, the Union still enjoys some support among the

employees and has resumed organizing efforts since December, demonstrating that it is

not too late for interim relief.[94] Thus, because fear of retaliation may completely

extinguish employee willingness to support the Union by the time a final Board order

issues, offers of interim reinstatement are necessary now to erase the chill before it is too

late to prevent remedial failure.[95] Hansen and Brewer's interim reinstatement will restore

the requisite leadership and mitigate the chilling effect on the organizing campaign by

sending an affirmative signal to employees that they can safely resume organizing

---

[93] *Schaub*, 250 F.3d at 971 (interim reinstatement of discharged union activist "combats the substantially diminished prospects of unionizing [the employer] if [the discriminatee] were not to return until after the Board reached a final resolution of th[e] case"); *Walsh v. Mountain View Care and Rehab. Ctr., LLC*, 2019 WL 2865891, at *10 (M.D. Pa. July 2, 2019) (ordering interim reinstatement because timetable for final Board order "hinders the [u]nion's efforts to organize" and allows employer to attain its "unlawful objectives"); *Overstreet v. David Saxe Prods., LLC*, 2019 WL 332406, at *9 (D. Nev. Jan. 24, 2019) ("Absent reinstatement, the union would face diminishing support through the firing of key union supporters whom the union would be unable to protect, thus further eroding support among the remaining employees.").

[94] The fact that the Union continues to enjoy some support after the unfair labor practices does not undercut the need for interim relief. Indeed, even when some employees feel "'totally uninhibited' in the exercise of their § 7 rights" there is sufficient chilling effect to warrant injunctive relief if "[a]t least some employees" are "afraid to act" in support of the union. *Pye*, 238 F.3d at 74-76.

[95] *See Frankl II*, 693 F.3d at 1057, 1066 (interim reinstatement of one employee organizer held just and proper); *Aguayo*, 853 F.2d at 746, 749 (eleven members of organizing committee); *Schaub*, 250 F.3d at 971 (one employee organizer); *Pye*, 238 F.3d at 75 (five employee organizers); *Sharp*, 225 F.3d at 1135 (six union supporters); *Angle*, 382 F.2d at 660-61 (four employee organizers); *Silverman*, 1986 WL 15735, at *1 (six union activists); *Absolute Healthcare*, 2022 WL 2275667, at *8 (one employee organizer); *David Saxe Prods.*, 2019 WL 332406, at *11-18 (seven union supporters); *Shamrock Foods Co.*, 2016 WL 8505125, at *5-6 (reinstatement of one union activist at large plant just and proper).

because the Board and courts will *timely* protect them if they face retaliation for their protected concerted activity.[96]

In addition, the passage of time here does not obviate the need for injunctive relief. Delay is significant only if the harm has occurred and the parties cannot be returned to the status quo, such that a final Board order is likely to be as effective as interim relief.[97] Here, the passage of time has not yet "so weakened the Union that even interim relief could not salvage it."[98] Notwithstanding the chilling impact of Respondent's unfair labor practices, the Union continues to enjoy some support among the employees and has

---

[96] *See Sharp*, 225 F.3d at 1135 (interim reinstatement "reasonably necessary to preserve the ultimate remedial power of the Board"). Although Brewer recently expressed disinterest in reinstatement at this time, given Hansen's interest in returning, Brewer is entitled to consider interim reinstatement under the protections of a Section 10(j) decree. *Gottfried v. Mayco Plastics, Inc.*, 472 F. Supp. 1161, 1166 (E.D. Mich. 1979), *aff'd*, 615 F.2d 1360 (6th Cir. 1980) (table decision). An offer of reinstatement to Brewer, even if ultimately rejected, will help send necessary reassurance to the remaining employees that they are free to exercise their statutory right to seek Union representation. *See David Saxe Prods., LLC*, 2019 WL 332406, at *9 n.4 (assigning little weight to whether the discriminatees wanted their jobs back because an offer of reinstatement also "is not just about making the discharged employees whole . . . [i]t also sends a message to other employees that retaliatory discharges will be redressed"); *Absolute Healthcare*, 2022 WL 2275667, at *8 (employee's return will signal to other employees that they are free to self-organize under the auspices of the Act); *NLRB v. Ona Corp.*, 605 F. Supp. at 886 (interim reinstatement of single discriminatee in large unit will send "affirmative signal"); *Heinrich Motors, Inc. v. NLRB*, 403 F.2d 145, 150 (2d Cir. 1968) (reinstatement offer has "dual purpose of protecting the discharged employee and demonstrating the [employer's] good faith to its other employees"). *See also Aguayo*, 853 F.2d at 750 (interim reinstatement "would revive the union's organizational campaign"); *Pye*, 238 F.3d at 75 (interim reinstatement of union supporters appropriate to preserve "spark to unionize"); *Kaynard*, 625 F.2d at 1053 (reinstatement of "active and open" union supporters just and proper to avoid "serious adverse impact on employee interest in unionization").

[97] *See Aguayo,* 853 F.2d at 750; *Gottfried v. Frankel*, 818 F.2d 485-86, 495 (6th Cir. 1987).

[98] *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th Cir. 1992).

continued to organize, demonstrating that it is not too late for interim relief to prevent

remedial failure. Moreover, the passage of approximately 14 months since the critical

violations here is within the parameters that the Ninth Circuit and other courts have found

appropriate in Section 10(j) proceedings.[99]

### 2.  Additional Relief is Just and Proper to Protect the Employees' Statutory Rights

The other requested injunctive relief is also just and proper. A broad cease-and-

desist order is appropriate to prevent further violations because, by discharging two lead

Union activists and engaging in other unlawful conduct that chilled employee interest in

unionization, Respondent has engaged in "egregious or widespread misconduct . . .

demonstrat[ing] a general disregard for the employees' fundamental statutory rights."[100]

Also, a public reading of the district court's order in front of the employees and a

representative of the Board is an "effective but *moderate* way to let in a warming wind of

---

[99] *See, e.g.*, *Frankl I*, 650 F.3d at 1363-65 (granting relief where Section 10(j) petition was filed almost three years after the first unfair-labor-practice charge); *Bloedorn*, 276 F.3d at 299-300 (injunction ordered on appeal even though more than two years had passed since the violation; interim relief remained "a vital means of preserving the Board's ultimate ability to provide meaningful redress for the wrongs alleged."). *See also Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 856 (5th Cir. 2010) (19 months between initial complaint and 10(j) petition); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544-45 (4th Cir. 2009) (18 months between issuance of complaint and request for 10(j) relief); *Hirsch v. Dorsey Trailers, Inc.*, 147 F.3d 243, 248-49 (3d Cir. 1998) (14 months between issuance of complaint and 10(j) petition).

[100] *Frankl II*, 693 F.3d at 1057, 1061; *see also Angle*, 382 F.2d at 657-58, 660-61; *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order).

information and, more important, reassurance."[101] Relatedly, posting the court's order during the pendency of the administrative proceedings, along with electronic dissemination of the order, will further inform and reassure employees of their rights.[102]

### 3. Serious Threatened Public Harm Outweighs any Harm to Respondent; Public Interest is Served by an Injunction

Respondent will suffer little, if any, harm if injunctive relief is granted.[103] Upon interim reinstatement, Respondent will receive the benefit of the experienced services of employees with no prior disciplinary or performance issues, while still retaining its managerial right to impose lawful discipline.[104] Moreover, interim reinstatement helps reduce Respondent's ultimate financial liability because it cuts off any continued accrual

---

[101] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *One Call Locators Ltd.*, 46 F. Supp. 3d at 932 (ordering notice reading as part of 10(j) relief); *David Saxe Prods.*, 2019 WL 332406, at *18; *Garcia v. Sacramento Coca-Cola Bottling Co., Inc.*, 733 F. Supp. 2d 1201, 1218 (E.D. Cal. 2010); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015).

[102] *See, e.g.*, *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1054 (W.D. Tenn. 2011) (ordering posting); *Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc.*, 2008 WL 544455, at *2 (W.D. Ky. Feb. 27, 2008) (ordering posting), *opinion clarified*, 2008 WL 4561573 (W.D. Ky. Oct. 10, 2008); *Drew-King v. Amazon.com Services, LLC*, 2022 WL 17083273, at *13 (E.D.N.Y. Nov. 18, 2022) (ordering electronic distribution of Section 10(j) order), *appeal docketed*, No. 22-3182 (2d Cir. Dec. 20, 2022).

[103] *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986) (any harm the company might suffer because of a temporary injunction "will only last until the Board's final determination").

[104] *See Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981); *Pye*, 238 F.3d at 75; *Electro-Voice, Inc.*, 83 F.3d at 1573.

of backpay.[105] In the event Respondent has hired replacement employees, it is well-settled that the Section 7 rights of discriminatees to interim reinstatement under Section 10(j) outweigh the job rights of their replacements.[106] The remaining proposed remedies are even less likely to pose a significant burden on Respondent. Accordingly, the balance of hardships tips in the Petitioner's favor. Interim relief in this case will vindicate the employees' statutory right to a free choice regarding unionization and preserve the Board's remedial power. In addition, it will serve the public interest by effectuating the will of Congress and ensuring that the Respondent's unfair labor practices do not permanently succeed.[107]

## V.     CONCLUSION

Petitioner has put forward strong evidence showing that Respondent violated the Act. Petitioner is likely to win before the Board, but absent injunction, the Board's remedial powers will be frustrated and Respondent will have permanently achieved its goals of stifling unionization through unlawful means. The public interest and the equities in this case weigh heavily in Petitioner's favor. Therefore, Petitioner respectfully requests this Court issue a temporary injunction.

---

[105] *See Hubbel v. Patrish L.L.C.*, 903 F. Supp. 2d 813, 818 (E.D. Mo. 2012); *Asseo v. Bultman Enterprises, Inc.*, 913 F. Supp. 89, 97 (D. P.R. 1995).

[106] *See Aguayo*, 853 F.2d at 750; *Pye*, 238 F.3d at 73, 75.

[107] *See Frankl I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed…."); *Pye*, 238 F.3d at 75 ("Section 10(j) interim relief is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining."); *Pan Am. Grain Co.*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").

1   **RESPECTFULLY SUBMITTED** this 6th day of June, 2024.

2

3                                         /s/ Tucker Bingham
                                          Tucker Bingham, Attorney (AZ#037427)
4                                         Tel: (602) 416-4746
                                          Fax:(602) 640-2178
5                                         Email: tucker.bingham@nlrb.gov

6
                                          On behalf of:
7                                         Cornele A. Overstreet, Regional Director
                                          National Labor Relations Board, Region 28
8                                         2600 N. Central Avenue, Suite 1400
                                          Phoenix, Arizona 85004
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26