**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornele A Overstreet, | No. CV-24-01356-PHX-DJH |
| Petitioner, | **ORDER** |
| v. | |
| Lucid USA Incorporated, | |
| Respondent. | |

Petitioner Cornele A. Overstreet ("Petitioner"), Regional Director of Region 28 of the National Labor Relations Board ("NLRB"), has filed a Complaint alleging that Respondent Lucid USA Incorporated ("Respondent" or "Lucid") has engaged in unfair labor practices in violation of Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(j), by stifling its employee's unionization efforts. (Doc. 1 at 1). Petitioner has also filed a Motion for Preliminary Injunction under Section 10(j),[1] which asks the Court to enjoin Respondent from engaging in further violations. (Doc. 12). This Motion is fully briefed. (Docs. 24; 26). The Court grants Petitioner's request for a preliminary injunction for the reasons that follow.[2]

////

---

[1] Unless otherwise noted, all "section" references are to the National Labor Relations Act, 29 U.S.C. § 160(j).

[2] Respondent has also filed a Motion to Dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1). (Doc. 55). Petitioner has filed a Response (Doc. 57), and the Respondent has not yet filed a Reply. The Court will address this Motion when it becomes fully briefed.

1    **I.    Background**

2         **A.    Unionization Efforts by Respondent's Employees**

3         Respondent is a manufacturer of electric vehicles in Casa Grande, Arizona.

4    (Doc. 1 at ¶ 2).  Petitioner alleges that Respondent instructed its employees to use a mobile

5    application to clock in and out of work while the plant was expanding.[3]  (Doc. 13-2 at 35).

6    Petitioner also alleges that Respondent's Employees were given thirty minutes before and

7    fifteen minutes after work to change into necessary personal protective equipment;

8    however, there is no written policy stating this.  (*Id*; Doc. 52 at 77–78).  Many employees

9    changed in the parking lot, rather than the bathrooms at the Plant, because they were small

10   and congested.[4]  (Doc. 13-2 at 35).  Respondent's employees were expected to work

11   twelve-hour shifts, five days a week.  (*Id*. at 38 (Affidavit of Amie Begay)).

12        These circumstances prompted some employees, including Ms. Amie Begay[5] and

13   Mr. Chad Brewer, to discuss the prospect of unionization.  (*Id*. at 39).  Mr. Brewer reached

14   out to the United Auto Workers Union ("UAW") and was put in contact with Ms. Carla

15   Villanueva.  (*Id*.)  On January 24, 2023, Ms. Begay and Mr. Brewer started distributing

16   union leaflets in Respondent's bathroom and break areas.  (*Id*. at 40).

17        After this, Ms. Begay observed that as she discussed unionization with a co-worker

18   in the breakroom, Jake Steel (Respondent's Production Manager) kept walking by to

19   eavesdrop on their conversation.  (*Id*. at 41).  Ms. Begay also states that, the next day,

20   Miguel Paredes (Senior Manager of Powertrain Manufacturing) offered her a promotion to

21

22   [3] Respondent's policy states that "[e]mployess must record time using the Company's time keeping system . . . It is the employee's responsibility to punch his/her hours correctly

23   including his/her meal break."  (Doc. 13-3 at 17).  There is no mention, in the exhibits already provided, of time to change or an app.

24   [4] Respondent states that their policy is that employees must clock in and out of work after

25   entering and exiting the facility.  (Doc. 24 at 9 (citing Doc. 24-1 at 3).  Respondent also states that employees are "required to use the timecard scanners ("time clocks") in the

26   building to clock in and out, not do so via their smartphones."  (*Id*.)  "The ability to clock in and out using a smartphone had initially been provided to employees when the Company

27   was newer and construction was occurring to build the Company facilities in Arizona. However, construction on the Powertrain facility had been completed well in advance of

28   the audit that led to the terminations of Begay and Brewer."  (*Id*.)

     [5] Ms. Amie Hansen got married in October of 2024 and changed her name to Amie Begay.

be a supervisor during the night shift.  (*Id*.)  When Ms. Begay expressed she was not interested in working the night shift, she was offered a position in a different department that paid more—which she accepted.  (*Id*. at 42).  A few days into her new position, Ms. Begay told Mr. Layton Ratliff (Respondent's Production Supervisor) that she felt like she was being "set up" for attempting to start a union.  (*Id*.)  Mr. Ratliff assured her she was simply offered a better position.  (*Id*.)

On February 6, 2023, Ms. Begay passed out new flyers from UAW, which Respondent's managers took down.  (*Id*. at 43).  Specifically, Ms. Begay alleges she saw Tiffany Lopez (Respondent's Human Resources Business Partner) throwing away the union literature.  (*Id*.)  The next day, Ms. Lopez terminated Ms. Begay.  (*Id*. at 43–44).  Ms. Lopez told Ms. Begay that she was being terminated for clocking in earlier than when she entered Respondent's facility and for clocking out two hours after she left the facility on November 8, 2022 (an election day).  (*Id*. at 44).  Ms. Begay states that her termination letter was signed by Mr. Ratliff, who was not her supervisor at that time.  (*Id*. at 45).  Ms. Begay tried to explain that she clocked in once she arrived at work and began changing in her car, and that Steve Ingles allowed her to leave early on November 8th so she could vote.  (*Id*.)  Respondent nevertheless terminated Ms. Begay.[6]  (*Id*.)

Mr. Brewer's affidavit alleges many of the same experiences as alleged by Ms. Begay.  (Doc. 13-2 at 47).  Importantly, he alleges that he and Ms. Begay put up union flyers in employee break areas outside of working hours or on their break, and that these flyers were thrown away by management.[7]  (*Id*. at 53).  He also states that Mr. Steel and

---

[6] Respondent's stated "Discipline and Standards of Conduct" policy states that "[d]isciplinary action may include a verbal warning, written warning, suspension with or without pay, and/or termination. The appropriate disciplinary action imposed will be determined by the Company. The Company does not guarantee that one form of action will necessarily precede another." (Doc. 24-1 at 159).  It also states that "[f]alsifying timecards or failing to accurately record time" is an action for which discipline way occur.  (*Id*.)  The Policy states that "[i]t is up to the employee's supervisor and the Company's management to decide whether corrective action, up to and including dismissal, is appropriate." (*Id*. at 160).

[7] Respondent's policy states that "[e]mployees may distribute or circulate any written or printed material only in non-work areas, during nonworking times."  (Doc. 13-3 at 98).

1
2
3
4

Mr. Ratliff told him he would get in trouble for visiting Ms. Begay in her new department on his break.[8]  (*Id.* at 52).  Mr. Brewer was then fired on the same day as Ms. Begay.  (*Id.* at 53).  Petitioner alleges that this has had a chilling effect on unionization efforts between the UAW and Respondent's employees.  (Doc. 13 at 9–10).

5

### B.    Related Proceedings

6
7
8
9
10
11
12
13
14

The UAW filed a charge with the NLRB[9] under Sections 8(a)(1) and (a)(3) alleging Respondent has and continues to engage in unfair labor practices.  (Doc. 1 at ¶ 4). Petitioner investigated these allegations and determined that there is "reasonable cause to believe" that Respondent is engaging in unfair labor practices in violation of 29 U.S.C. §§ 158(a)(1) and (3).  (*Id.* at ¶ 5(b)).  These alleged unfair labor practices include, among other things, "confiscating employees' union literature, engaging in surveillance of employees' union activity, threatening employees in response to union activity, directing employees not to engage in union activity, and discharging employees spearheading union organizing efforts."  (*Id.* at ¶ 6).

15
16
17
18
19
20
21
22
23
24

In a parallel administrative action, Petitioner issued a Consolidated Complaint (Doc. 13-2 at 7–15) on January 2, 2024, and Notice of Hearing setting an administrative hearing to commence on October 9, 2024.  (*Id.* at ¶ 5(c)).  Respondent's Answer to this Consolidated Complaint denied engaging in any unfair labor practices.  (*Id.* at ¶ 6). Petitioner argues in its Complaint that unless Respondent is enjoined and restrained from engaging in unfair labor practices, it will continue to engage in those acts pending the proceedings before the NLRB and that Respondent's employees will be deprived of their rights under 29 U.S.C. § 157 to "form, join, or assist a labor organization or to freely refrain from any and all such activities, a harm which cannot be remedied in due course by the Board."  (*Id.* at ¶ 8).

25
26
27

[8] Respondent states that it maintains a buffer time between production lines to ensure there is no backlog or idle time, so production lines have different break schedules.  So, Brewer was told he would get in trouble because he was bothering Begay while she was on the clock.  (Doc. 24 at 16).

28

[9] The NLRB is an independent agency established by the NLRA to interpret and administer the Act.  29 U.S.C. § 153(a).

1

### C.     The Preliminary Injunction Hearing

The Court held a hearing on Plaintiff's request for a preliminary injunction on August 9, 2023.  (Doc. 52).  Tiffany Lopez, Jake Steele, Layton Ratliff, Chad Brewer and Amie Begay all testified.  (*Id.* at 3).  The Court will briefly restate some of the relevant testimony and evidence from the hearing.

Ms. Lopez, Respondent's "human resource business partner," testified first.  (Doc. 52 at 26–27).  She oversees the powertrain department, where Brewer and Begay were employed.  (*Id.* at 28).  Ms. Lopez testified that she learned of union activity at the facility on January 19, 2023, but that she did not know who was involved at that time.  (*Id.* at 32–33).  This same day, however, Ms. Lopez sent an email asking "Powertrain Salary" to "collect and forward to me all employee attendance records/ violations" for Respondent's senior leadership.  (Doc. 48, Ex. 16 at 1).  Ms. Lopez testified that she was forwarded a link for a unionization meeting and that she clicked on it, but that she exited right away.  (Doc. 52 at 35).  In an email also written on January 19, 2023, Ms. Lopez told her colleagues that she attempted to join the meeting and that a "Carla Villanueva" was the host."  (Doc. 48, Ex. 14a).  These two emails were sent less than two minutes apart.  (Doc. 52 at 42).

Mr. Chris Atwood told Ms. Lopez about the "union interest survey barcodes" on January 24, 2023, and Ms. Lopez replied that "the LAST thing we want moving in here is a Union."  (Doc. 48, Ex. 18 at 2).  She also told Mr. Atwood that she would do "anything" to stop the attempt to unionize.  (Doc. 52 at 66).  Ms. Lopez also testified that on January 25, 2023, Mr. Steele made her aware of union literature with QR codes on them.  (*Id.* at 47–48).  The next day, Ms. Lopez asked one of Respondent's security officers for "badge reports" for Ms. Begay and Mr. Brewer.[10]  (*Id.* at 50).  She requested Mr. Brewer's badge reports on January 31, 2023, as well.  (*Id.* at 59).  On February 6, 2024, Ms. Lopez sent her supervisor, Bo Cucuz, an email with a picture of union literature and the subject line reads "Union propaganda collected from Breakroom at Hanna today."  (Doc. 48, Ex. 29 at 1).

---

[10] Ms. Lopez stated that "badge reports" are a historical report of when and where an employee's badge has been used in the facility.  (Doc. 52 at 49).

On February 7, 2023, employees began noticing the union literature which Ms. Begay and Mr. Brewer were distributing.  (Doc. 48, Ex. 31 at 1–2).  Mr. Cucuz then directed Mr. Paredes to "assign salaried employees you trust to walk through the bathrooms and other areas and pick up any literature which is being posted and/or dropped on tables and benches on each shift.  Have them drop off any information they find with [Ms. Lopez]."  (*Id*. at 1).  The same day, Ms. Lopez terminated Ms. Begay and Mr. Brewer for time theft.  (Doc. 52 at 71).

Mr. Steele Testified next and confirmed that, after hearing of union activity, he and Mr. Ratliff met with Mr. Brewer and discussed how to improve morale at the facility, including parking and hazard pay.  (*Id*. at 167–68).  Mr. Ratliff testified he attended the meeting and stated that unionization was not discussed.  (*Id*. at 192).  In contradiction, Mr. Brewer testified that during the meeting he told Steele and Ratliff that "this is the reason why we're organizing" and that Steele responded, "that is his right."  (*Id*. at 212).

Mr. Brewer testified that he is the employee who contacted the UAW as he was familiar with unions from his previous employment.  (*Id*. at 203–04).  He and Carla Villanueva discussed how Respondent's employees could unionize.  (*Id*. at 205).  Mr. Brewer testified that, after he started distributing union literature, Mr. Steele started following him around—even showing up outside on his smoke breaks.  (*Id*. at 208).  As well, after Ms. Begay transferred to the wire-bonding department, Mr. Ratliff told Mr. Brewer that he could not walk over to that department, that he was going to "get himself in trouble," and that "they are watching you."  (*Id*. at 211).  In the aftermath of Mr. Brewer and Ms. Begay's termination, a coworker messaged Mr. Brewer that "everyone is scared shitless."  (Doc. 12 at 18; Doc. 48, Ex. 9 at 1).

Ms. Begay was the last witness to testify.  (*Id*. at 238).  She testified that she had been employed at Lucid for years.  She described Respondent's procedures for changing into protective equipment and its time clock procedures.  (*Id*. at 240).  She also stated that once, while discussing unionization with a co-worker in the break room after work, Mr. Steele began "messing around" with the refrigerator, opening and closing the door and

1     lingering for a few minutes. (*Id*. at 243). Ms. Begay felt that Mr. Steele was eavesdropping

2     on their conversation. (*Id*.) Ms. Begay also testified that on January 26, 2023, after the

3     first set of union flyers were distributed, out of the blue, Mr. Paredes offered her a transfer

4     to the wire-bonding department, which came with a pay raise. (*Id*. at 244–45). Ms. Begay

5     testified that she also distributed union flyers on February 6, 2023, and that she was

6     terminated by Ms. Lopez the next day. (*Id*. at 247–248).

7        The Court finds the testimony of Respondent's witnesses Ms. Lopez, Mr. Steele and

8     Mr. Ratliff lacked aspects of credibility. Ms. Lopez consistently testified as being unaware

9     of unionization activity and only reluctantly acknowledged her conduct, after being

10    confronted with emails of which she authored or was a participant on. Even when

11    confronted with instances of animus toward unions, she reluctantly acknowledged any

12    animus. Regarding Mr. Steele and Mr. Ratliff, each had unusually faint recollections of

13    the relevant events although each were directly involved in supervising the involved

14    employees, monitoring the union activities taking place in their work areas, and aware of

15    or present for the termination of the employees. In particular, the Court notes Mr. Ratliff's

16    failure to recall was extreme. (*See* Doc. 52 198-99). The Court likewise carefully observed

17    Petitioner's witness' demeanor while testifying. The Court finds Ms. Begay and Mr.

18    Brewer credible. They testified consistent with their affidavits and had little difficulty

19    recalling the events of January and February 2023 leading up to their respective

20    terminations.

21        At the summation of the hearing, the Court ordered Petitioner and Respondent to

22    file summation briefs (Doc. 47); which they have done. (Docs. 53–54).

23    **II.**     **Legal Standard**

24        "Section 10(j) permits a district court to grant relief 'it deems just and proper.' " 29

25    U.S.C. § 160(j). *Frankl v. HTH Corp*., 650 F.3d 1334, 1355 (9th Cir. 2011). "To decide

26    whether granting a request for interim relief [i.e., an injunction,] under Section 10(j) is 'just

27    and proper,' district courts consider the traditional equitable criteria used in deciding

28    whether to grant a preliminary injunction." *McDermott v. Ampersand Publ'g*, LLC, 593

F.3d 950, 957 (9th Cir. 2010).  The Supreme Court recently held that "district courts **must** apply the traditional four factors articulated in *Winter* when considering the Board's requests for a preliminary injunction under § 10(j)." *Starbucks Corp. v. McKinney*, 602 U. S. ____, No. 23-367, 11 (2024) (emphasis added).

Preliminary injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief were denied, (3) that the equities weigh in the plaintiff's favor, and (4) that the public interest favors injunctive relief.  *Id.* at 20. The movant carries the burden of proof on each element of the test.  *See Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980).  The last two factors merge when, as here, the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

District courts must "keep[ ] in mind that the underlying purpose of § 10(j) is 'to protect the integrity of the collective bargaining process and to preserve the [NLRB's] remedial power while it processes the charge.' " *Id.* (quoting *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 459–60 (9th Cir.1994) (en banc)).  Injunctive relief under Section 10(j) is intended to preserve the status quo pending final action by the Board.  *Scott v. Stephen Dunn & Assocs.*, 241 F.3d 652, 660 (9th Cir.2001) (abrogated on other grounds).  The status quo to be protected is that which existed prior to the employer's unlawful response to the employee's organizing campaign.  *Id.*  "While some deference is accorded to the NLRB on factual issues, . . . whether to issue an injunction rests within the discretion of the district court." *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 923 (D. Ariz. 2014) (citing *Miller*, 19 F.3d at 458).

The Ninth Circuit also employs a "sliding scale" approach under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*,

632 F.3d 1127, 1131 (9th Cir. 2011).  "The moving party may meet [its] burden by showing either: (1) a combination of probable success on the merits and a possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor."[11]  *Nouveau Riche Corp. v. Tree*, 2008 WL 55381513, at *4 (D. Ariz. Dec. 23, 2008) (citing *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003)).  "[C]ourts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" and should be particularly mindful of the "public consequences in employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

### a. Deferential Standard of Review for Section 10(j) Injunctions

In the specific context of Section 10(j) petitions for an injunction, the likelihood of success on the merits is "a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred" and that the reviewing court will "grant a petition enforcing that order, if such enforcement were sought." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011).  The Regional Director in a Section 10(j) proceeding can make a threshold showing of likelihood of success on the merits "by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1187 (9th Cir. 2011) (citing *Frankl*, 650 F.3d at 1356)).  Conflicting evidence "does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Frankl*, 693 F.3d at 1063.

When the Director seeks and receives approval from the NLRB before filing a Section 10(j) petition for an injunction, the Director is "owed special deference" because

---

[11] Respondent notes that showing "serious questions going to the merits," rather than actual likelihood of success, is not sufficient "to support the entry of a preliminary injunction, regardless of the other factors."  (Doc. 24 at 7 (citing *McDermott*, 593 F.3d at 964)).  Respondent is correct, as Petitioner must show "the existence of serious questions going to the merits *and* that the balance of hardships tips sharply in its favor." *Nouveau Riche Corp.*, 2008 WL 55381513, at *4 (emphasis added).

the "likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred." *Id.* (quoting *Frankl*, 650 F.3d at 1355). "That the NLRB 'itself decid[ed] to file a Section 10(j) petition might signal its future decision on the merits, assuming the facts alleged in the petition withstand examination at trial," because it files for Section 10(j) injunctions rarely." *Id.* (quoting *McDermott*, 593 F.3d at 964). However, when the Regional Director, without Board approval, files a Section 10(j) petition, courts are not required to "accord significance to the fact of the petition's filing in evaluating the Director's likelihood of success." *Frankl*, 650 F.3d at 1356. Petitioner does not aver that it had Board approval to file this Section 10(j) petition, so, it is not owed "special deference." *Id.* It is only accorded "some deference" on factual issues. *One Call Locators Ltd.*, 46 F. Supp. 3d at 923.

**III.   Discussion**

Petitioner seeks a Preliminary Injunction under Section 10 that restrains Respondent from:

1. Discharging its employees for engaging in union organizational activity and/or other concerted activity protected under Section 7 of the National Labor Relations Act;

2. Surveilling employees' actual or suspected union activities, or creating the impression among employees that their union activities are under surveillance;

3. Threatening employees with unspecified reprisals if they engage in union activity and/or other concerted activity protected under Section 7 of the National Labor Relations Act;

4. Instructing employees not to engage in union activity and/or other concerted activity protected under Section 7 of the National Labor Relations Act;

5. Removing or confiscating actual or suspected union materials distributed in non-work areas of Respondent's premises;

6. Promising or granting employees benefits, including promotional opportunities or transfers to higher paying positions, to interfere with employees' organizing activities, except that nothing herein shall be construed as requiring Respondent to revoke any change in position or wage increase or other benefits it has previously granted;

7.   Soliciting grievances from employees and impliedly or expressly promising to remedy those grievances to discourage union activity and/or other concerted activity protected under Section 7 of the National Labor Relations Act; and

8.   In any other manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under Section 7 of the Act, including to self-organization, to form labor organizations, to join or assist the Union or any other labor organization, to bargain collectively through representatives of their own choosing and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protected, or to refrain from any and all such activities.

(Doc. 1 at 11–12).   Petitioner also asks that the injunction instruct Respondent to take the following affirmative actions:

1.   Within five (5) days of the Court's issuance of the Injunction Order, offer, in writing, interim reinstatement to Amie Hansen (Begay) and Chad Brewer to their former positions of employment, including their former schedules, or if those positions no longer exist, to substantially equivalent positions without prejudice to their seniority or any other rights or privileges they previously enjoyed, displacing, if necessary, any employees who may have been hired or reassigned to replace them;

2.   Within five (5) days of the Court's issuance of the Injunction Order, post physical copies of the Injunction Order setting forth the relief granted at Respondent's Casa Grande, Arizona facility where notices to employees are customarily posted, including but not limited to employees' break room(s), as well as translations in other languages as necessary to ensure effective communication to Respondent's employees as determined by the Board's Regional Director of Region 28, said translations to be provided by Respondent at its expense and approved by the Regional Director; said postings shall be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; all employees shall have free and unrestricted access to said postings, and Respondent shall grant to agents of the Board reasonable access to each worksite to monitor compliance with this posting requirement;

3.   Within five (5) days of the Court's issuance of the Injunction Order, distribute electronic copies of the Order specifying the relief granted to all employees employed by the Respondent at its Casa Grande, Arizona facility, via email and all intranet or internet sites or other

electronic platforms or applications that Respondent customarily uses to communicate with employees;

4.  Within ten (10) days of the Court's issuance of the Injunction Order, convene one or more mandatory meetings, on working time and at times when Respondent customarily holds employee meetings and scheduled to ensure the widest possible attendance, at Respondent's Casa Grande, Arizona facility, during which the Injunction Order specifying the relief granted will be read to the employees by a responsible official of Respondent in the presence of a Board agent, or at Respondent's option, by a Board agent in the presence of a responsible official of Respondent. Respondent shall also afford the Union, through the Regional Director, reasonable notice and opportunity to have a representative present when the Injunction Order is read to employees. Interpreters shall be made available for any individual whose language of fluency is other than English at Respondent's expense. Respondent shall announce the meeting(s) for the Injunction Order reading in the same manner it would customarily announce a meeting to employees; the meeting(s) shall be for the above-stated purpose only. Individuals unable to attend the meeting to which they have been assigned will be able to attend a subsequent meeting during which the same reading shall take place under the same conditions. Respondent shall allow all employees to attend these meetings without penalty or adverse employment consequences, either financial or otherwise; and,

5.  Within twenty (20) days of the issuance of the Injunction Order, file with the District Court and submit a copy to the Regional Director of Region 28 of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of the Injunction Order, including the manner in which it has posted the documents required by the Court's decree, including how and where the documents have been posted, and the date(s), time(s), and location(s) that the Injunction Order specifying the relief granted was read to employees and by whom, as required by the Court.

(*Id.* at 13–16).

/ / / /

/ / / /

/ / / /

### A.      The Preliminary Injunction

Petitioner seeks a preliminary injunction under Section 10(j) of the Act, 29 U.S.C. § 160(j).[12]   (Doc. 12 at 11).   Petitioner argues that injunctive relief is appropriate because the *Winter* factors tip sharply in their favor.   (*Id*. at 16).   Respondent argues Petitioner fails to meet his burden under the *Winter* factors because he cannot prove that Respondent harbored animus towards UAW organizing at its facility or a causal connection between the alleged animus and the decision to terminate former employees.   (Doc. 24 at 1–2).   The Court agrees with Petitioner.

### 1.      Likelihood of Success on the Merits

The first *Winter* factor requires Petitioner to show a likelihood of success on the merits of, or serious questions going to, the merits of its claim that Respondent has and continues to violate Section 8(a)(1) and 8(a)(3) of the Act.   A reasonable probability of success is all that need be shown for preliminary injunctive relief—an overwhelming likelihood is not necessary.   *Candrian v. RS Indus., Inc.*, 2013 WL 2244601, at *3 (D. Ariz. May 21, 2013) (citing *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991)).   *McDermott v. Ampersand Pub., LLC*, 593 F.3d 950, 964 (9th Cir. 2010).

### a.      Petitioner's Alleged Section 8 Violations

Petitioner argues that its affidavits and exhibits demonstrate a substantial likelihood of Respondent's violations under Section 8(a)(1) and (a)(3).   (Doc. 13 at 16).   Sections 8(a)(1) and (a)(3) provide that it is an unfair labor practice for an employer: "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization" 29 U.S.C. § 158(a)(1), (3).   Section 157 guarantees employees' rights

---

[12] Section 10(j) provides that "The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."   29 U.S.C. § 160(j).

1   to:

> 2   self-organization, to form, join, or assist labor organizations, to bargain
> 3   collectively through representatives of their own choosing, and to engage in
>     other concerted activities for the purpose of collective bargaining or other
> 4   mutual aid or protection, and shall also have the right to refrain from any or
> 5   all of such activities except to the extent that such right may be affected by
>     an agreement requiring membership in a labor organization as a condition of
> 6   employment.

7   29 U.S.C. § 157.

8          Petitioner states that "[i]t is well settled that the test of interference, restraint, and

9   coercion under Section 8(a)(1) of the Act does not turn on the employer's motive or on

10  whether the coercion succeeded or failed. The test is whether the employer engaged in

11  conduct which, it may reasonably be said, tends to interfere with the free exercise of

12  employee rights under the Act." (Doc. 13 at 16 (citing *American Tissue Corp*., 336 NLRB

13  435, 441-42 (2001) (citing *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946)).

14         Petitioner specifically argues that Respondent violated Section 8 by: (1) discharging

15  union organizers Begay and Brewer; (2) confiscating employees' union literature; (3)

16  surveilling employees' protected activity; (4) soliciting employees' grievances; and (5)

17  making additional coercive statements and conduct. (Doc. 13 at 19–25). The Court agrees

18  and will address each of these alleged Section 8 violations in turn.

19                              **i.      The Discharge of Begay and Brewer**

20         Petitioner argues that it can show that Respondent violated Section 8(a)(3) by

21  discharging Ms. Begay and Mr. Brewer (the leaders of the unionization efforts).

22  (Doc. 13 at 27). Petitioner states that Ms. Begay and Mr. Brewer "openly engaged in pro-

23  Union activities at work beginning January 25[, 2023]. Soliciting support for the Union,

24  distributing flyers, and engaging in conversations with coworkers about the union are

25  protected under the Act." (*Id*.) Conversely, Respondent argues Ms. Begay's and Mr.

26  Brewer's misconduct warranted termination under its policies and practices, so, it had

27  "substantial and compelling reasons" to terminate them. (Doc. 24 at 13). Respondent also

28  argues that it was not aware that Ms. Begay and Mr. Brewer had engaged in any known

protected concerted or union activities, therefore, Petitioner cannot show that anti-union animus was a motivating factor in their termination.  (*Id*.)

Under Section 8(a)(3), it is an unlawful labor practice for an employer to terminate an employee in order "to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3*); Frankl v. HTH Corp*. (*Frankl II*), 693 F.3d 1051, 1062 (9th Cir. 2012) ("An employer violates Section 8(a)(3) when the employee's involvement in a protected activity was a substantial or motivating factor in the employer's decision to discipline or terminate the employee.").  The NLRB "utilizes a burden-shifting framework first set forth in *Wright Line*, 251 NLRB 1083 (1980) to evaluate § 8(a)(3) violations." *Overstreet v. Absolute Healthcare*, 2022 WL 2275667, at *5 (D. Ariz. June 23, 2022) (citing *Tschiggfrie Props., Ltd*., 368 NLRB No. 120, at *5 (2019)).

First, a petitioner must show that the employees union activities were a motivating factor in the employer's decision to terminate them.  *See Wright Line*, 251 NLRB at 1089. The elements of such a showing are "(1) 'union or other protected concerted activity by the employee,' (2) 'employer knowledge of that activity,' and (3) 'animus on the part of the employer.' " *Absolute Healthcare*, 2022 WL 2275667, at *5 (*quoting Electrolux Home Prods*., 368 NLRB No. 34, at *3 (2019)).   Once a petitioner makes this showing, the burden of persuasion shifts to the employer to "establish that it would have discharged [the employee] for a legitimate, nondiscriminatory reason regardless of [their] union activity." *Id*. (quoting *Tschiggfrie*, 368 NLRB No. 120, at *5).   "An employer cannot prove this affirmative defense where its 'asserted reasons for a discharge are found to be pretextual.' " *Id*. (quoting *United Nurses Ass'ns of Cal. v. NLRB*, 871 F.3d 767, 779 (9th Cir. 2017)). The Court may rely on circumstantial as well as direct evidence in determining an employer's motivation.  *Lippincott Indus., Inc. v. N.L.R.B*., 661 F.2d 112, 116 (9th Cir. 1981).

### (1)     Union Activity

Petitioner has adduced testimony and evidence that Ms. Begay and Mr. Brewer engaged in protected union activity by soliciting support for the union, distributing flyers,

1    and engaging in conversations with coworkers about unionizing.   (Doc. 13 at 29).

2    Respondent argues that Ms. Begay and Mr. Brewer's "self-interested acts in engaging in

3    timecard misconduct" do not constitute union or other protected concerted activity.  (Doc.

4    24 at 8).

5            To be "engaged in 'concerted activity,' an employee must act 'with or on behalf of

6    other employees, and not solely by and on behalf of the . . . employee himself.' "  *N.L.R.B.*

7    *v. Mike Yurosek & Son, Inc*., 53 F.3d 261, 266 (9th Cir. 1995) (quoting *Pacific Electricord*

8    *Co. v. NLRB*, 361 F.2d 310, 310 (9th Cir.1966)).  "The Act does not require that employees

9    combine with one another in any particular way."  *Id*. (citing *NLRB v. City Disposal Sys.,*

10   *Inc*., 465 U.S. 822, 835 (1984)). "If 'a single employee, acting alone, participates in an

11   integral aspect of a collective process,' the activity may nonetheless be considered

12   'concerted' for purposes of the Act."  *Id*.

13          The Court finds that Petitioner has shown that Ms. Begay and Mr. Brewer were

14   engaged in union or other protected concerted activity.  Mr. Brewer contacted UAW

15   representative Carla Villanueva on or about January 17, 2023, and organized and attended

16   the zoom meeting which Ms. Lopez attempted to access.  (Doc. 52 at 203–04; Doc. 13-2

17   at 49). The eight employees who attended this meeting, including Begay and Brewer,

18   discussed with Ms. Villanueva how they could unionize. (*Id*.)  On January 24 and February

19   6, 2023, Brewer and Begay disbursed union literature in allowable places and discussed

20   unionization with interested co-workers in the break room.  (*Id*. at 242–243; Doc. 13-2 at

21   50, 53).  These actions, in the aggregate, can reasonably be seen as "affecting the terms or

22   conditions of employment" because Brewer and Begay were trying to better the conditions

23   for Respondent's employees in the powertrain department. See 29 U.S.C. § 157; *Mike*

24   *Yurosek & Son, Inc*., 53 F.3d at 266.  So, Petitioner has shown that Mr. Brewer and Ms.

25   Begay were engaged in protected concerted activity under Section 157.

26                          **(2)      Employer Knowledge**

27          Respondent argues that it was not aware that Begay and Brewer had engaged in any

28   known union activities.  (Doc. 24 at 8).  Yet, during the hearing, Petitioner easily showed

that Respondent knew of Ms. Begay and Mr. Brewers union activity because they openly engaged in it and were observed by their supervisors, and the Human Resources Business Partner, Ms. Lopez.  (Doc. 13 at 29).

Knowledge does not need to be established by direct evidence but may "rest on circumstantial evidence from which a reasonable inference of knowledge may be drawn." *Montgomery Ward & Co., Inc*., 316 N.L.R.B. 1248, 1253 (1995), *enf'd*, 97 F.3d 1448 (4th Cir. 1996).  Knowledge "may be inferred based on, for example, the timing of the allegedly discriminatory action, the respondent's general knowledge of union activities, and expressions of anti[-]union animus by the respondent." *Clements v. Alan Ritchey, Inc*., 165 F. Supp. 2d 1068, 1078 (N.D. Cal. 2001).

Here, there is both direct and circumstantial evidence of employer knowledge.  Mr. Brewer testified that after exploring unionization he attended a meeting on January 31, 2023, with Mr. Ratliff and Mr. Steele to see what could be done to boost morale. (Doc. 52 at 212).  Mr. Brewer told Steele and Ratliff that employees were struggling with inconsistent schedules, long hours, not enough room to change into PPE, lack of employee parking and a lack of hazard pay.  (*Id*.)  Mr. Brewer then told them this is why the powertrain employees were exploring unionizing.  (*Id*.)  Mr. Steele acknowledged this and told Mr. Brewer that unionization was his right.[13]  (*Id*.)  This testimony is direct evidence that Respondent knew Mr. Brewer was engaged in union activity.

There is also a vast amount of circumstantial evidence that bolsters Petitioner's argument that Respondent knew Mr. Brewer and Ms. Begay were engaged in union activity.  For example, Ms. Lopez sent an email on January 19, 2023, to Mr. Cucuz that she learned from Mr. Steele that Powertrain employees were attempting to unionize. (Doc. 48, Ex. 15 at 1).  She also reports that she asked whether union literature was being "passed/signed" but that there was no evidence of this "yet."  (*Id*.)  She finishes this email with a question: whether it is possible to have "Legal" consider having meetings regarding unionization.  (*Id*.)  This same day, Ms. Lopez sent an email to "Powertrain Salary" and

---

[13] Though present at this same meeting, Mr. Ratliff had no recollection of this comment.

requested "all employee attendance records/ violations" for Respondent's senior leadership. (Doc. 48, Ex. 16 at 1). On January 26, 2023, Ms. Lopez also emailed a security officer and requested badging history of Amie Begay and Chand Brewer. (Doc. 48, Exs. 22–23). Ms. Lopez also spoke with another supervisor, Mr. Atwood, and stated that "you and I both know the LAST thing we want moving in here is a Union." (Doc. 18). Mr. Atwood responded with one word: "agreed." (*Id.*) Ms. Lopez also sent a picture of the union literature to her supervisor, Mr. Cucuz, to tell him of union "propaganda" being distributed in the breakroom. (Doc. 48, Ex. 29 at 2).

As illustrated, Petitioner has demonstrated through direct and circumstantial evidence that Respondent knew of ongoing union activity at its facility and knew that Ms. Begay and Mr. Brewer were involved in this activity. *See Clements*, 165 F. Supp. 2d at 1078.

### (3)   Animus

The last element Petitioner must show is animus. Proof of animus may be based on "direct evidence or, under certain circumstances, it may be inferred from circumstantial evidence based on the record as a whole." *Absolute Healthcare*, 2022 WL 2275667, at \*5 (quoting *Boar's Head Provisions Co., Inc.*, 370 NLRB No. 124, slip op. at 25 (2021)). Factors supporting an inference of animus include "the timing of the adverse action in relation to the protected activity, other unfair labor practices committed, respondent's reliance on pretextual or shifting reasons to justify the adverse action, disparate treatment of members based on protected activity and a respondent's deviation from past practice." *Id.* (citing *Laborers' Int'l Union of N. Am., Local Union No. 91 (Scrufari Constr. Co., Inc.)*, 370 NLRB No. 42, slip op. at 9 (2020)). The evidence of animus "must support 'a causal relationship . . . between the employee's protected activity and the employer's adverse action against the employee." *Id.* Discharge within days of protected activity is "strongly probative of animus." *Id.* at \*5 (D. Ariz. June 23, 2022) (citing *Napleton Cadillac of Libertyville*, 367 NLRB No. 6, slip op. at 15 (2018)).

The Court finds that Ms. Begay and Mr. Brewer were discharged based, in part,

because of anti-union animus.  Ms. Lopez wrote to Mr. Atwood that "the LAST thing we want moving in here is a Union."  (Doc. 18).  Ms. Lopez told Mr. Atwood that she would do "anything" to stop the attempt to unionize.  (Doc. 52 at 66).  After this, she specifically investigated Ms. Begay's and Mr. Brewer's time entries, then initiated termination proceedings for violating company policy—a policy which was not written down or relayed to them.  (*Id.* at 77–78).  Mr. Cucuz also directed Mr. Paredes to "assign salaried employees you trust to walk through the bathrooms and other areas and pick up any literature which is being posted and/or dropped on tables and benches on each shift.  Have them drop off any information the find with [Ms. Lopez]."  (Doc. 48, Ex. 31 at 1).  Finally, Ms. Begay and Mr. Brewer were terminated a day after engaging in protected activity and a discharge within days of protected activity is "strongly probative of animus.".  *See Absolute Healthcare*, 2022 WL 2275667, at *5.  It is easy for this Court to conclude that these actions, and their timing in relation to Ms. Begay's and Mr. Brewer's union activities, demonstrate that both were terminated by Respondent due to anti-union animus.

### (4)    Legitimate Nondiscriminatory Reason for Termination

Petitioner has shown the employees union activities were a motivating factor in Respondent's decision to terminate them, so the burden of persuasion shifts to Respondent.  *Absolute Healthcare*, 2022 WL 2275667, at *5.  Respondent alleges that Begay's and Brewer's misconduct warranted termination under its policies and practices, so, it had "substantial and compelling reasons" to terminate Begay and Brewer.  (Doc. 24 at 13).

To rebut Petitioner's showing, Respondent must show by a preponderance of the evidence that "it would have discharged [the employees] for a legitimate, nondiscriminatory reason regardless of [their] union activity." *Absolute Healthcare*, 2022 WL 2275667, at *5.  "In other words, a respondent must show that it would have taken the challenged adverse action in the absence of protected activity, not just that it could have done so." *Id*.

Respondent has not shown that it would have discharged Ms. Begay or Mr. Brewer

for a legitimate, nondiscriminatory reason regardless of their union activity given the fact that they did not terminate other similarly situated employees not engaged in union activity. The timing also shows that Respondent's stated reason of time theft is pretextual. *See id*. ("An employer cannot prove this affirmative defense where its 'asserted reasons for a discharge are found to be pretextual.' ").  The hearing evidence showed that no one informed Ms. Begay of Respondent's changed employee's policy from time-card to app log-in use.[14]   (Doc. 52 at 253 ("Q. When were you told to stop clocking in from your phone?  A.  I wasn't.")).

Collectively viewed, this evidence shows that (1) Ms. Begay and Mr. Brewer engaged in protected union activity, (2) Lucid knew of this activity, and (3) Respondent was hostile towards these unionization efforts.  So, Petitioner has shown a likelihood of success on the merits of its Section 8(a)(1) and (a)(3) claims.

### ii.    Confiscating Employees' Union Literature

Petitioner argues it can also show a likelihood that Respondent interfered and restrained its employees' rights under Section 8(a)(1) because employees have the right to distribute union organizational literature in nonworking areas during nonworking time. (*Id*. at 19 (citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 570-71 (1978)).  It also notes that an employer unlawfully interferes with that right by confiscating union literature distributed by employees in nonworking areas absent a legitimate basis.  (*Id*. (citing *Desert Springs Hosp. Med. Ctr*., 369 NLRB No. 16 (2020) (finding employer violated the Act by confiscating flyers known to be union literature and not for any housekeeping reason)).  Respondent argues that it has "the right to restrict access to their bulletin boards and to remove other postings and flyers." (Doc. 24 at 13 (citing *Fleming Co., Inc. v. NLRB*, 349 F.3d 968, 974 (7th Cir. 2003)).[15]

---

[14] The Court notes that the Respondent's evidence is at odds because, while Ms. Begay was being investigated for time-card theft, her supervisors were offering her promotions in position and an increased salary.

[15] Indeed, employers have the right to restrict access to their bulletin boards.  *J.C. Penney Co. v. N.L.R.B*., 123 F.3d 988, 997 (7th Cir. 1997) (citing *Guardian Indus. Corp. v. NLRB*, 49 F.3d 317, 318 (7th Cir.1995).  An employer cannot, however, discriminate against a union's posted material by "disparately applying its posting policy to hinder the union's

There is sufficient evidence in the record to demonstrate a likelihood of success on the merits of this claim.  Respondent knew of union literature being distributed as early as January 24, 2023.  (Doc. 48, Ex. 18 at 2).  Mr. Brewer states that he witnessed management discarding their union literature which said: "let's improve our working conditions." (Doc. 13-2 at 50).  Ms. Begay also alleges she saw Ms. Lopez throwing away the union literature which she distributed from UAW on February 6th.  (Doc. 13-2 at 43).  Mr. Cucuz, Respondent's Human Resources Manager, directed Mr. Paredes to "assign salaried employees you trust to walk through the bathrooms and other areas and pick up any literature which is being posted and/or dropped on tables and benches on each shift.  Have them drop off any information the find with [Ms. Lopez]."  (Doc. 48, Ex. 31 at 1).  Indeed, the flyers with QR codes on them state "Tired of your working conditions? You aren't alone. Join us in our efforts of unity to improve our jobs.  For us, by us. This is not a company survey. We are workers, just like you."  (Doc. 48, Ex. 10 at 2).

This evidence shows that Respondent has unlawfully confiscated union literature distributed by employees in nonworking areas absent a legitimate basis.  *See Valley Health Sys., LLC*, 369 NLRB No. 16 (Jan. 30, 2020) ("It is well established that confiscation of union literature can violate Section 8(a)(1) of the Act.") (citations omitted).  Furthermore, contrary to its assertion, Respondent's written policy on distribution does not restrict its employees access to their bulletin boards.  Its written policy provides that: "[e]mployees may distribute or circulate any written or printed material only in non-work areas during nonworking times. No employee may distribute or circulate any written or printed material in work areas at any time, or during their own working time."  (Doc. 2-3 at 98).  These facts establish a likelihood of success on the merits of Petitioner's confiscation claim.

### iii.    Surveillance

Petitioner next argues it can show Respondent's unlawful interference under Section 8(a)(1) because, as soon as Begay and Brewer began distributing union literature and discussing unionization with other employees, supervisor Steele started acting out of the

efforts."  *Id.*

1   ordinary and following Begay and Brewer.  (Doc. 13 at 20).  Respondent argues that the
2   evidence of surveillance is weak.  (Doc. 24 at 14–15).

3          The Board has found that an employer violates the Act by "maintaining surveillance
4   of the meetings and meeting places of [the union] and of the activities of . . . employees in
5   connection with [the union].' "  *Garcia v. Green Fleet Sys., LLC*, 2014 WL 5343814, at
6   *12 (C.D. Cal. Oct. 10, 2014) (quoting *Pennsylvania Greyhound Lines, Inc*., 1 NLRB 1,
7   48 (1935)).  "In determining whether an employer's statement has created an unlawful
8   impression of surveillance, the test is 'whether the employees would reasonably assume
9   from the statement that their union activities had been placed under surveillance.' "  *Id.*
10  (citing *Bridgestone Firestone*, 350 NLRB 526, 529 (2007)).

11         Petitioner has demonstrated a likelihood of success on its surveillance claim.  Ms.
12  Begay testified that, while she and another employee were off the clock in the break room
13  discussing unionizing, Mr. Steele kept walking by the two women and lingered within
14  earshot of them and repeatedly opened and closed the refrigerator's door without putting
15  anything in it or taking anything out.  (Doc. 52 at 243).  Mr. Brewer also testified that, after
16  he and Ms. Begay began distributing UAW flyers, Mr. Steele began following him.
17  (*Id*. at 208).  Mr. Brewer stated that, when he would take a break to smoke, Mr. Steele
18  began "showing up" with him outside.  (*Id*.)  Mr. Brewer testified that he told Mr. Steele
19  that he felt like he was following him.  (*Id*.)  Mr. Steele allegedly said he was not, and that
20  he was just trying to get his steps in and get some fresh air.  (*Id*. at 209).  Mr. Steele testified
21  that he had "no recollection" of this event.[16]  (*Id*. at 176).  The Court finds that this
22  evidence, when given "some deference" on factual issues,[17] demonstrates a likelihood of
23  success as the employees who were engaged in union activity felt like they had been placed
24  under surveillance by Respondent.  *See Garcia*, 2014 WL 5343814, at *12.  Also, while
25  Mr. Steele's lack of recall testimony conflicts with the evidence of surveillance, conflicting
26  evidence "does not preclude [Petitioner] from making the requisite showing for a section

27  ---
[16] The Court notes that the witnesses who were employed by Respondent had trouble
28  recalling much of the alleged events at issue.

[17] *One Call Locators Ltd*., 46 F. Supp. 3d at 923.

- 22 -

10(j) injunction." *Frankl*, 693 F.3d at 1063.  So, Petitioner has shown a likelihood of success of its surveillance claim.

### iv.     Soliciting Employees' Grievances

Petitioner argues that it was a violation of Section 8(a)(1) and (a)(3) for Respondent to offer Ms. Begay a promotion in light of organizing activity and that this offer constitutes coercive conduct. (Doc. 13 at 17).  It also argues that Mr. Ratliff's statement to Mr. Brewer that "he wanted to discuss what could be done to 'improve morale' at the facility carries an implied promise to remedy the issues that he had invited Brewer to discuss." (*Id*. at 22).  Respondent argues this was not a violation considering its open-door policy and that Ms. Begay's promotion is reflective of its open-door policy at work.  (Doc. 24 at 19).

An employer violates the Act when it solicits grievances during a union organizing campaign if the solicitation is accompanied by an express or implied promise to remedy the grievance. *See Maple Grove Health Care Ctr*., 330 NLRB 775 (2000).  Employers with past practices of soliciting employee grievances may continue doing so during a unionization campaign, but not if it "significantly alters its past manner and methods of solicitation." *Walmart, Inc*., 339 NLRB 1187, 1187 (2003).  An employer violates Section 8(a)(1) of the Act when it offers an employee a supervisory position in order to induce them and other employees to abandon the Union.  *Great Lakes Warehouse Corp*., 330 NLRB 807, 807 n.1 (2000).

Petitioner has demonstrated a likelihood of success on this claim.  Mr. Paredes suddenly offered Ms. Begay two different promotions after she began unionization efforts—one of which she accepted. (Doc. 13-2 at 41).  Mr. Ratliff and Mr. Steele also met with Mr. Brewer on issues of employee concern shortly after they discovered his efforts to unionize—which was uncommon.  (Doc. 52 at 212).  Ratliff and Steele told Brewer they wanted to meet to see what they could do to change the morale of the company. (*Id*.)  These acts significantly altered Respondent's past manner and methods of solicitation and included an implied promise to remedy Mr. Brewer's grievances.   *See Walmart, Inc*., 339 NLRB at 1187; *Maple Grove Health Care Ctr*., 330 NLRB 775.   Petitioner has

1    demonstrated a likelihood of success here.

2                    **v.    Coercive Statements and Conduct**

3          Petitioner also argues that it was a violation of Section 8(a)(1) for Respondent to

4    tell Mr. Brewer he would get in trouble for visiting Ms. Begay on his break.

5    (Doc. 13 at 25).  Petitioner notes a similar case.  *See In re Golden State Foods Corp*., 340

6    NLRB 382, 382 n.3 (2003) (finding supervisor's statement that "eyes are on you and you

7    need to watch your step" to pro-union employee created impression of surveillance and

8    violated Section 8(a)).   Respondent argues that there is a reasonable explanation for this:

9    that it maintains a buffer time between production lines to ensure there is no backlog or

10   idle time, so production lines have different break schedules.  (Doc. 24 at 16).

11         Petitioner has demonstrated a likelihood of success as to this claim.  Mr. Brewer

12   testified that there was a supervisor in a different department, "AMP-1," who found one of

13   the UAW flyers and help it up to the entire department and said: "whoever is handing these

14   out [] will be fired."  (Doc. 52 at 235).  Furthermore, after Ms. Begay transferred to the

15   wire-bonding department, Mr. Ratliff told Mr. Brewer that he could not walk over to that

16   department, that he was going to "get himself in trouble," and that "they are watching you."

17   (*Id*. at 211).  This evidence demonstrates a likelihood of success on Petitioner's coercive

18   statements claim when given "some" deference.  *See Golden*, 340 NLRB at 382 n.3.

19                    **2.    Likelihood of Irreparable Harm**

20         Under the second *Winter* factor, "[a] plaintiff must do more than merely allege

21   imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate

22   threatened injury as a prerequisite to preliminary injunctive relief." *Forefront*

23   *Dermatology S.C. v. Crossman*, 642 F. Supp. 3d 947 (D. Ariz. 2022) (quoting *Caribbean*

24   *Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).  "Speculative injury

25   does not constitute irreparable injury sufficient to warrant granting a preliminary

26   injunction." *Id*.; *see also All. for the Wild Rockies*, 632 F.3d at 1131 (emphasis in original)

27   ("Under *Winter*, plaintiffs must establish that irreparable harm is likely, not just possible,

28   in order to obtain a preliminary injunction.").  Irreparable harm is harm "that cannot be

redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted).

In the Ninth Circuit, a Regional Director seeking an injunction under Section 10(j) must show that irreparable harm is likely under *Winter*. *Small*, 661 F.3d at 1191. The Ninth Circuit has emphasized, however, that "the Director need not prove that irreparable harm is certain or even nearly certain." *Id*. It has also commented that "[an] alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority is irreparable harm." *Id*. (citing Frankl, 650 F.3d at 1362 (holding that the district court did not abuse its direction in determining that the Director showed a likelihood of irreparable harm where he established a likelihood of success on the merits)).

Petitioner argues that "[w]ithout timely interim injunctive relief . . . Respondent's illegal actions will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power. In short, Respondent will forever benefit from its illegal conduct." (Doc. 13 at 34). Petitioner further states that reinstatement of Begay and Brewer is necessary because "the unlawful termination of union activists can create a leadership void sufficient to derail a campaign." (*Id*. at 34–35 (citing *Schaub v. W. Michigan Plumbing & Heating, Inc*., 250 F.3d 962, 971 (6th Cir. 2001) (without reinstatement of discriminate, "there would be no one at the company organizing for the union"); *N.L.R.B. v. Electro-Voice, Inc*., 83 F.3d 1559, 1573 (7th Cir. 1996) (noting that the discharged organizers' "absence deprives the employees of the leadership they once enjoyed")).

Respondent argues that Petitioner cannot demonstrate irreparable harm due to the delay in seeking this injunction, the fact that the hearing is set for October 9, 2024, and Petitioners failure to demonstrate that Respondent has engaged in unfair labor practices. (Doc. 24 at 22). Petitioner argues, in its Reply, that the termination of Ms. Begay and Mr. Brewer has a demonstrable chilling effect on any effort to unionize. (Doc. 26 at 9). It also notes that "[t]he timing of employees' shift in support draws a clear link with Respondent's

conduct in discharging the lead organizers. Thus, the 'record shows an observed drop-off in union activity' and '[s]uch diminished support for a union can be evidence that irreparable harm is likely absent a preliminary injunction.' " (*Id*. at 9–10 (citing *Overstreet v. Shamrock Foods Co*., 679 Fed.Appx. 561, 565 (9th Cir. 2017)).

Petitioner has sufficiently shown a likelihood irreparable harm. "It is well settled that 'the fear of employer retaliation after the firing of union supporters is exactly the "irreparable harm" contemplated by § 10(j).' " *Rubin ex rel. N.L.R.B. v. Vista Del Sol Health Servs., Inc*., 80 F. Supp. 3d 1058, 1103 (C.D. Cal. 2015) (citing *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir.2001)); *see also NLRB v. Electro–Voice, Inc*., 83 F.3d 1559, 1572 (7th Cir.1996) (noting the "chilling effect" on union organizing that often follows the illegal discharge of key union members). There is evidence in the record that employees are afraid of retaliation for engaging in union activity, namely: a coworker text messaged Mr. Brewer that "everyone is scared shitless" in the aftermath of Mr. Brewer and Ms. Begay's termination. (Doc. 12 at 18; Doc. 48, Ex. 9 at 1). The fears expressed by Respondent's employees that they will be discharged or mistreated if they continue to support the union justify a finding of irreparable harm. *See Rubin*, 80 F. Supp. 3d at 1103.

### 3.      Balance of Equities and the Public Interest

Because the last two factors merge when the government is a party, the court will consider together whether the balance of equities weigh in the plaintiff's favor and whether the public interest favors injunctive relief in conjunction. *See Drakes Bay Oyster Co.*,747 F.3d at 1092; *see also Winter*, 555 U.S. at 20. Petitioner argues that Respondent will suffer little, if any, harm if injunctive relief is granted. (Doc. 13 at 43). Respondent argues that the relief sought would cause it hardship because Petitioner seeks to have it reinstate employees it reasonably believes engaged in theft, and their reinstatement could cause disruption and potential termination of current employees. (Doc. 24 at 24). It also argues that the public interest weighs against an injunction because it did not violate the Act. (*Id*. at 25).

/ / / /

1    "[D]istrict courts must give serious consideration to the balance of equities." *Earth*

2    *Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (citation omitted).  In doing so,

3    courts must consider "all of the competing interests at stake." *Id*.  "The basic function of

4    a preliminary injunction is to preserve the status quo pending a determination of the action

5    on the merits." *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 704 (9th Cir.

6    1988). "Status quo is defined as the last, uncontested status which preceded the pending

7    controversy." *Susanville Indian Rancheria v. Leavitt*, 2007 U.S. Dist. LEXIS 18702, at

8    *21 (E.D. Cal. Feb. 28, 2007) (quoting *Regents of the Univ. of Cal.*, 747 F.2d 511, 514 (9th

9    Cir 1984)).  "In each case, a court must balance the competing claims of injury and must

10   consider the effect on each party of the granting or withholding of the requested relief."

11   *Amoco Production Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).  Specifically,

12   in assessing whether a Regional Director has satisfied the balance of the equities prong,

13   "the district court must take into account the probability that declining to issue the

14   injunction will permit the alleged unfair labor practice to reach fruition and thereby render

15   meaningless the Board's remedial authority." *Small*, 661 F.3d at 1196 (citing *Frankl*, 650

16   F.3d at 1365).

17          The Court finds that the balance of equities tips in Petitioners favor and that

18   Respondent will suffer little, if any, harm if injunctive relief is granted.  Refraining from

19   granting injunctive relief to Petitioner could be fatal to the employees' unionization efforts

20   as the record showed that employees once interested in unionization, now express  being

21   fearful of engage in union activity.  Ms. Begay's and Mr. Brewer's termination has had a

22   chilling effect.  *Small*, 661 F.3d at 1196.

23          As for the public interest, this analysis requires the Court to "consider whether there

24   exists some critical public interest that would be injured by the grant of [injunctive] relief."

25   *Pure Wafer Inc. v. City of Prescott*, 275 F. Supp. 3d 1173, 1179 (D. Ariz. 2017) (citation

26   omitted).  In Section 10(j) petitions, the public interest is "to ensure that an unfair labor

27   practice will not succeed because the Board takes too long to investigate and adjudicate the

28   charge." *Small*, 661 F.3d at 1197 (citing *Frankl*, 650 F.3d at 1365).  Moreover, the public

interest favors ensuring compliance with federal law. *See N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1113 (9th Cir. 2010) ("[I]t is obvious that compliance with the law is in the public interest"). When the Regional Director makes a strong showing of likelihood of success and of irreparable harm, they "will have established that preliminary relief is in the public interest." *Small*, 661 F.3d at 1197 (citing *Frankl*, 650 F.3d at 1365).

Petitioner again argues that Respondent will suffer little, if any, harm if injunctive relief is granted since these two factors combine.  (Doc. 13 at 43).  Respondent argues that "while in some circumstances, '[a] strong claim can be presented on behalf of the rights of employees' under the NLRA, any such rights under the NLRA '[do] not trump the First Amendment.' " (Doc. 24 at 24 (citing *McDermott*, 593 F.3d at 966 n. 10)).  Indeed, the Ninth Circuit has held that "significant First Amendment implications of enjoining peaceful speech activity mean[s] the ordinary principles of deference to Board interpretation of the Act d[o] not apply."  *McDermott*, 593 F.3d at 958 (citation omitted). Respondent does not argue that their First Amendment rights are at issue here, however. (*Id*.)  Respondent also argues that the Board processes adequately protect the Union and the individuals named in the charges.  (*Id*.)

The Court finds there is a strong public interest in issuing an injunction due to Petitioner's likelihood of success on the merits and the public's interest in protecting "the integrity of the collective bargaining process." *Pye v. Excel Case Ready*, 238 F.3d 69, 75, n.11 (1st Cir. 2001) ("§ 10(j) injunctive relief is designed to protect the public interest in the collective bargaining process").  As thoroughly discussed herein, the record evidence sufficiently supports this.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

**IV.      Conclusion**

  For the foregoing reasons, the Court finds Petitioner has satisfied the four-part standard set forth in *Winter* for preliminary injunctive relief.  The petition will therefore be granted.  The injunction will be issued by separate order.

  Accordingly,

  **IT IS ORDERED** that Petitioner's Petition for Temporary Injunction under Section 10(j) of the National Labor Relations Act, As Amended (Doc. 12) is **GRANTED**.

  Dated this 13th day of September, 2024.

Honorable Diane J. Humetewa
United States District Judge